# Illinois Official Reports

## Appellate Court

*People v. Heritsch*, 2017 IL App (2d) 151157

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEN HERITSCH, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-1157 |
| Filed | December 20, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 14-CF-20; the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Thomas A. Lilien, and R. Christopher White, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, Lawrence M. Bauer, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Birkett concurred in the judgment and opinion. |

## OPINION

¶ 1      Following a stipulated bench trial in the circuit court of Boone County, defendant, Ken Heritsch, was convicted of possession of more than 10 grams but not more than 30 grams of a substance containing cannabis (720 ILCS 550/4(c) (West 2014)). Because defendant had a prior conviction of possession of cannabis, the offense was a Class 4 felony. Defendant was sentenced to a three-year term of probation and 90 days in the Boone County jail. Defendant's conviction was based on the discovery of cannabis in his vehicle following a traffic stop and a dog sniff. On appeal, defendant argues that the trial court erred in denying his motion to suppress that evidence. We affirm.

¶ 2      At the hearing on defendant's motion to suppress, Belvidere police officer Richard Zapf testified that, on January 24, 2014, at 7:04 p.m., he observed a silver Mercury Sable proceeding west on Bypass 20. He had previously been given a description of the vehicle in connection with a report of a possibly impaired driver. Zapf's squad car was equipped with a video camera. A video recording was admitted into evidence. We note that the time stamp on the video recording establishes a timeline of events. In the description of facts that follows, parenthetical references to the time stamp represent the time of day (in hours, minutes, and seconds) at which particular events appear on the video recording.

¶ 3      Zapf testified that he observed the Mercury cross the fog line, after which he pulled the vehicle over (7:05:34 p.m.). Shortly thereafter, Officers Bogdonas and Coduto arrived at the scene. At some point Zapf's shift supervisor, Sergeant Gardner, also arrived at the scene. Zapf approached the driver's side of the Mercury (7:06:11 p.m.). Defendant was driving the Mercury. Zapf asked defendant for his driver's license and proof of insurance. Zapf then started to walk back to his squad car (7:07:29 p.m.). Before reaching the squad car, Zapf spoke briefly with Bogdonas about his observations of defendant's condition. At the end of the conversation, Zapf asked Bogdonas to try to get defendant's consent for a search of the Mercury (7:08:12 p.m. to 7:08:20 p.m.). Zapf then returned to his squad car and ascertained that defendant's driver's license was valid and that he had no outstanding warrants. Zapf decided to issue a warning to defendant for crossing the fog line.

¶ 4      Meanwhile, Bogdonas had defendant step out of his vehicle, and she searched his person. Defendant did not consent, however, to a search of his vehicle. Bogdonas approached Zapf and told Zapf that defendant was being an "asshole" (7:09:53 p.m.). Zapf had been writing a warning to defendant, but after speaking with Bogdonas, Zapf decided to issue defendant a citation for improper lane usage. At that point, Zapf had written only defendant's name on the warning. Zapf then spoke briefly with Gardner. Zapf told Gardner that he had decided to issue a citation to defendant because Bogdonas said that defendant was a "jerk." (7:10:59 p.m.). Gardner then told Zapf to summon Officer Grubar, who worked with a drug detection dog, to the scene (7:11:02 p.m.). Zapf made a radio call to Grubar at 7:11:07 p.m. Grubar responded at 7:11:33 p.m. and told Zapf that she was unavailable. Zapf ended the call at 7:11:55 p.m. Shortly thereafter, Zapf received a radio communication from Boone County deputy sheriff Kevin Smyth, who indicated that he would bring his drug detection dog, Bosco, to the scene (7:12:29 p.m. through 7:12:47 p.m.). When Smyth arrived, he had Bosco conduct a free air sniff of the Mercury. Zapf then searched the vehicle, found cannabis, and placed defendant under arrest.

¶ 5      Zapf testified that, while waiting for Smyth to arrive, he was in his vehicle and was working on defendant's citation. Bosco completed the free air sniff while Zapf was still working on the citation. When Zapf finished writing the citation, he stepped out of his vehicle. Smyth was questioning defendant. Zapf testified that he walked to defendant, who was standing in front of Zapf's vehicle. Smyth was walking back to his own vehicle. We note that the video recording shows that, when Zapf exited his squad car, he walked directly to defendant's vehicle.

¶ 6      Smyth testified that identifying drugs by odor was among the things Bosco was trained to do. When Smyth arrived at the scene, he retrieved Bosco and started walking him toward defendant's vehicle. Defendant was not in the vehicle. Zapf was sitting in his squad car. Smyth walked Bosco to the driver's side of defendant's vehicle. Smyth saw Bosco respond to the odor of drugs. Smyth opened the driver's-side door, and Bosco jumped in the car and indicated on an ashtray in the center console and on a lunchbox. Smyth then pulled Bosco out of the vehicle and approached defendant. The video recording shows that Bosco climbed into defendant's vehicle at 7:18:09 p.m. Smyth then walked over to defendant and spoke with him from 7:18:39 p.m. to 7:19:15 p.m. Zapf is then seen outside his vehicle, walking toward defendant's vehicle a few seconds later. As noted, Zapf testified that he stepped out of his squad car when he finished writing the citation and that Smyth was questioning defendant. Zapf testified that, when he stepped out of his squad car, Smyth was returning to his own vehicle. This appears to have taken place at about 7:19:15 p.m., a little over a minute after Bosco detected drugs in defendant's vehicle.

¶ 7      Zapf described the steps involved in writing a citation or a warning. He testified that the steps for a citation and a warning are the same up to the point where the officer must look up and write the statutory citation for the traffic violation on a citation and assign a court date. For either a citation or a warning, the officer first uses his or her computer to determine whether the motorist's license is valid. This takes about two to three minutes. Next, the officer uses his or her computer to check the motorist's criminal history. It takes 2½ to 3 minutes to enter the information needed for a criminal history search and another 2 minutes or so for the computer to return the results. The officer then begins to write up the warning or citation. First the officer fills in a case number, which is generated by dispatch when the officer calls in a traffic stop. Next, the officer fills in the motorist's name, address, eye color, hair color, and date of birth. The officer also fills in the driver's license number and expiration date. It takes 1½ to 2 minutes to fill in that information. The officer then fills in the date and time of the traffic stop. Next, the officer fills in information about the vehicle, *i.e.*, the make, model, and year, the license plate number, and the expiration date of the license plates. Zapf testified that he retrieved defendant's vehicle information from his computer. Because, in this case, the dispatch involved an identified vehicle, this information was available to Zapf before he pulled the vehicle over. Transferring the information onto the ticket generally takes about a minute. When writing a citation, the officer looks up the statutory citation for the motorist's traffic violation. That takes about two minutes. Finally the officer assigns a court date (which takes about a minute) and then signs and dates the ticket.

¶ 8      Upon review of a ruling on a motion to suppress, the trial court's findings of fact are entitled to great deference, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Jarvis*, 2016 IL App (2d) 141231, ¶ 17. The trial

court's legal conclusion whether the evidence must be suppressed is subject to *de novo* review. *Id.*

¶ 9    Although a police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense (*People v. Abdur-Rahim*, 2014 IL App (3d) 130558, ¶ 26), the traffic stop can become unlawful "if it is prolonged beyond the time reasonably required to satisfy its initial purpose" (*People v. Reedy*, 2015 IL App (3d) 130955, ¶ 25). The United States Supreme Court has observed that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015). According to the Court, "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at ___, 135 S. Ct. at 1614. In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at ___, 135 S. Ct. at 1615. Although an officer may also conduct checks unrelated to the traffic stop's mission, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at ___, 135 S. Ct. at 1615.

¶ 10    A dog sniff during a traffic stop does not inherently violate the fourth amendment. *Id.* at ___, 135 S. Ct. at 1612 (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)). However, because a dog sniff is not an ordinary incident of a traffic stop (*id.* at ___, 135 S. Ct. at 1615), it must be conducted in a manner that does not prolong the stop. In *Rodriguez*, an officer conducted a dog sniff after issuing a warning ticket to a motorist, prolonging the stop by about seven or eight minutes. *Id.* at ___, 135 S. Ct. at 1613. The Eighth Circuit ruled that the additional period of detention was a *de minimis* intrusion on the motorist's liberty that did not run afoul of the fourth amendment. The Supreme Court disagreed, rejecting the Eighth Circuit's *de minimis* exception to the rule that investigations outside the mission of the stop may not prolong the stop. *Id.* at ___, 135 S. Ct. at 1615-16.

¶ 11    The *Rodriguez* Court also rejected the government's argument that "an officer may 'incremental[ly]' prolong a stop to conduct a dog sniff so long as the officer is reasonably diligent in pursuing the traffic-related purpose of the stop, and the overall duration of the stop remains reasonable in relation to the duration of other traffic stops involving similar circumstances." *Id.* at ___, 135 S. Ct. at 1616. According to the Court, the government's argument was essentially that an officer who expeditiously completes all tasks related to the traffic stop "can earn bonus time to pursue an unrelated criminal investigation." *Id.* at ___, 135 S. Ct. at 1616. The Court responded as follows:

"The reasonableness of a seizure *** depends on what the police in fact do. [Citation.] In this regard, the Government acknowledges that 'an officer always has to be reasonably diligent.' [Citation.] How could diligence be gauged other than by noting what the officer actually did and how he did it? If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.' [Citation.] As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.' [Citation.] The critical question, then, is not whether the dog sniff occurs before or after the

officer issues a ticket, *** but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop,' [citation]." *Id.* at ___, 135 S. Ct. at 1616.

¶ 12    In *People v. Pulling*, 2015 IL App (3d) 140516, a police officer stopped a vehicle for speeding. As a result of routine inquiries, the officer discovered that the driver's license had been suspended. About 16 minutes after the stop began, the officer conducted a dog sniff, which took about 45 seconds and resulted in the discovery of crack cocaine. Although the officer was not preparing citations during the stop, the State argued that the length of the stop would have been the same if he had been. Thus, according to the State, the stop was not unduly prolonged. The Third District disagreed, reasoning that "[i]f [the officer] had completed the tickets prior to or after the free-air sniff, the stop still would have been prolonged by this unrelated investigation that was not supported by independent reasonable suspicion." *Id.* ¶ 18.

¶ 13    We find *Pulling*'s reasoning unpersuasive. If drugs are detected at a time when the officer would otherwise still have been writing a ticket, we fail to see how, at that point, any time has been added to the stop. Beyond that point, further detention is justified by the detection of drugs. In this regard, *Pulling* appears to be in conflict with the Third District's subsequent decision in *Reedy*. In that case, two or three officers engaged in questioning unrelated to the purpose of a traffic stop. The questioning lasted less than five minutes, after which one officer returned to his vehicle to begin writing a warning ticket, while another officer conducted a dog sniff. If confronted with these facts, the *Pulling* court presumably would have held that the questioning prolonged the stop. In contrast, however, the *Reedy* court concluded that the dog sniff was proper because there was no evidence that, but for the earlier questioning, the ticket would have been completed and delivered before the dog detected drugs in the vehicle. *Reedy*, 2015 IL App (3d) 130955, ¶¶ 32, 38.

¶ 14    Here, defendant argues that "Zapf resolved the basis for the stop when he learned the defendant was not impaired and decided to write a warning." According to defendant, "[h]ad Zapf focused on writing the warning notice rather than repeatedly stopping to discuss searching the defendant's vehicle or attempting to locate a canine unit, despite no suspicion of unlawful activity, he necessarily would have completed the warning notice prior to the arrival of the canine unit." Thus, defendant maintains that Zapf improperly prolonged the traffic stop by asking Bogdonas to attempt to get defendant's consent to a vehicle search and by "abandoning his preparation of the warning ticket, beginning to write a citation, and arranging for the arrival of a canine unit."

¶ 15    Zapf chose to issue a citation rather than a warning after defendant refused to consent to a search. Although the choice is questionable, defendant cites no authority that it represents a departure from the mission of the traffic stop. Furthermore, because Zapf testified that he had written only defendant's name on the warning, his preliminary decision to issue a warning could have had only a negligible effect on the duration of the stop.

¶ 16    We accept, for purposes of our analysis, that seeking defendant's consent to a search and arranging to bring a drug detection dog to the scene were unrelated to the mission of the stop. If these tasks interrupted Zapf's work on the mission of the stop, then Zapf necessarily completed the mission later than he otherwise would have. Under *Pulling*, that would appear to be dispositive. However, under the better-reasoned *Reedy* decision, there must be evidence that, but for the activities unrelated to the mission of the stop, Zapf would have finished

writing defendant's citation and delivered it to defendant before Bosco detected drugs in defendant's vehicle.

¶ 17     Review of the video from Zapf's squad car shows that Zapf spent 8 seconds talking to Bogdonas about getting defendant's consent to search and a total of about 40 seconds actually speaking with Grubar and Smyth on the radio about bringing a drug detection dog to the scene.

¶ 18     We note that, based on Zapf's description of the tasks involved in writing a citation and the time required to complete those tasks, the time spent writing the citation here does not appear to be unreasonable. The trial court found that Zapf was working at a "normal pace" and was not "dragging his feet just to wait for [the] dog." This finding is not against the manifest weight of the evidence. Tasks unrelated to the mission of the stop added very little time—perhaps a minute—to the process, but roughly the same amount of time appears to have passed from the point when Bosco detected drugs in defendant's vehicle until Zapf completed writing the citation. And Zapf had yet to deliver the ticket to defendant, which would have taken some additional time. Thus, as in *Reedy*, the evidence does not show that, but for activities unrelated to the mission of the stop, Zapf would have finished writing the ticket and would have delivered it to defendant before Bosco detected drugs in defendant's vehicle. Accordingly, we conclude that the activities unrelated to the mission of the stop did not prolong the stop; they did not cause the stop to extend beyond the point at which Bosco's detection of drugs provided probable cause to believe that the vehicle contained drugs. See *People v. Neuberger*, 2011 IL App (2d) 100379, ¶ 9.

¶ 19     For the foregoing reasons, the judgment of the circuit court of Boone County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 20     Affirmed.