2019 IL App (2d) 180630
No. 2-18-0630
Opinion filed September 3, 2019

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | Nos. 17-CF-2888 17-CF-2889 |
| LEWIS C. McKELVY and FABIAN T. HARDEN, | ) ) ) ) | Honorable Theodore S. Potkonjak, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Spence concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants, Lewis C. McKelvy and Fabian T. Harden, were each charged with unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)) and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(C); (a)(1), (a)(3)(A-5)). The charges were based on evidence recovered when a vehicle in which they were passengers was stopped for speeding. They moved to suppress the evidence on the basis that the traffic stop was prolonged beyond the time necessary to address the traffic violation. The trial court granted the motion, and the State brought this appeal. We reverse and remand.

¶ 2                          I. BACKGROUND

¶ 3      North Chicago police officer Muhamed Alka testified that, on October 29, 2017, at about 1:45 a.m., he observed a blue sedan traveling west on Argonne Drive at a high speed.  The vehicle turned left onto Lewis Avenue.  Alka paced the sedan, which was traveling at 40 miles per hour in a 30-mile-per-hour zone.  Alka had previously been alerted that there had been a shooting in Lake Forest and that "there was a blue vehicle with a subject inside that may be armed."  At about 1:17 a.m., Alka had received a dispatch from the Waukegan Police Department indicating that the vehicle might be "in the region of Sheridan Road in North Chicago."  Sheridan Road was 19 or 20 blocks from Lewis Avenue.

¶ 4      Alka stopped the sedan.  As he approached, he saw three people, including defendants.  Harden was in the front passenger seat and McKelvy was in the rear passenger seat.  Alka called for assistance and then walked up to the passenger side of the car and spoke to the driver, Jerreyn Smith.  Alka asked Smith for identification.  Alka also asked Smith why he was driving so fast.  Harden told Alka that they were going to Lake Forest Hospital because his cousin had been shot.  Harden seemed nervous.  Alka received identification from all the occupants of the vehicle and ran warrant checks.

¶ 5      Within two or three minutes, Officers Deven Tolver and Corey Friel arrived at the scene.  Friel approached the driver's side of the vehicle and Tolver went to the passenger side.  Alka asked Smith to exit the vehicle.  Alka explained that he did so because "it would be a safer position *** to speak with the driver outside of the vehicle away from the other occupants."  Alka added that he "wanted to perform a safety pat-down to make sure that the driver was unarmed."  Once Smith had exited the vehicle, Alka performed a pat-down search.  As a safety precaution, Alka decided that the passengers should also be removed from the vehicle.  He asked Tolver to remove Harden.  After asking Harden to exit the vehicle, Tolver opened the front

passenger-side door. Tolver then yelled " 'Gun.' " Alka grabbed his own weapon and instructed Harden to make his hands visible. Tolver removed a 9-millimeter Beretta handgun from the vehicle and handed the weapon to Alka to ensure that it was out of Harden's reach. Harden was then removed from the vehicle and handcuffed. Tolver and Friel removed McKelvy from the vehicle. McKelvy had a firearm in his waistband.

¶ 6      Alka was wearing a body camera during the encounter, but he did not activate it until about a minute after stopping the vehicle. Alka testified that Harden was removed from the vehicle about five minutes after he activated the camera. A recording from the body camera was played at the hearing and admitted into evidence. Tolver can be heard shouting "gun" 5 minutes and 43 seconds into the recording.

¶ 7      Asked what he was investigating when Tolver and Friel arrived, Alka responded:

"Initially, I was investigating the initial offense, which was speeding. However, given the circumstances of the vehicle matching the description of the suspicious vehicle call we got from the Waukegan Police, given the subject may be armed inside the vehicle, I proceeded my investigation with reference to those circumstances."

¶ 8      On cross-examination, Alka testified that there was no warrant for the arrest of any of the occupants of the vehicle. After checking for warrants, Alka learned that a person of interest in the Lake Forest shooting was wearing a blue shirt. Alka also testified that Harden's demeanor on the video recording was different from his demeanor when Alka initially approached him. Harden had calmed down in the minute before Alka activated his body camera. Alka testified that his investigation was initially "for a traffic stop and any possible information related to the incident." He also testified that, when Harden said that he was related to a shooting victim, the

encounter "evolved from a traffic stop to information referenced to a shooting." Alka started writing a traffic ticket only after defendants were arrested.

¶ 9    Tolver testified that Friel was already at the scene when he arrived. Friel was standing next to the front driver's-side door of a blue vehicle. Alka was standing near the vehicle, conducting Law Enforcement Agencies Data System checks on its occupants. Tolver was aware of the shooting in Lake Forest. He testified that there was "a very vague description at the time of a subject in a blue shirt." McKelvy was wearing a blue shirt.

¶ 10    The vehicle's occupants seemed nervous. After Smith stepped out of the vehicle, Alka asked Tolver to remove Harden. Tolver started to open the front passenger-side door. Harden grabbed the door and tried to keep it closed. When Tolver got the door open, he saw a handgun in the door's "side pouch" and yelled " 'Gun.' " Tolver testified that McKelvy was seated in the driver-side rear seat. Tolver removed McKelvy from the vehicle, handcuffed him, and placed him on the ground. As Tolver was doing so, McKelvy said " 'Get it off my hip.' " When McKelvy was on the ground, Tolver recovered a handgun from his waistband.

¶ 11    Tolver was wearing a body camera, but he did not activate it until a few minutes after he arrived at the scene. He explained that he was distracted when he arrived, because Alka was telling him what assistance was needed. In addition, the cameras were "fairly new," so activating the camera was not Tolver's "first instinct." Tolver activated the camera while speaking with Harden. He acknowledged that it was a mistake not to have done so earlier.

¶ 12    Friel testified that, when he responded to Alka's request for assistance, he was aware that there had been a shooting in Lake Forest and that there were reports of an armed subject in a vehicle in North Chicago. McKelvy matched the description of one of the suspects in the Lake Forest shooting, and the occupants of the vehicle seemed nervous. Friel was wearing a body

camera. He did not immediately activate it when he arrived at the scene, but he activated it less than a minute later. Friel acknowledged that he should have activated the camera earlier but said that he did not intentionally refrain from activating it. Asked whether the purpose of the traffic stop was to investigate the Lake Forest shooting, Friel replied, "I don't know *** the exact reason for the initial traffic stop, but I do know upon us arriving there, it evolved into that, yes, if it was not already that."

¶ 13    Defendants moved for sanctions against the State based on the failure of Alka, Tolver, and Friel to immediately activate their body cameras upon confronting the occupants of the vehicle. The trial court indicated that, as a sanction, it would not consider the officers' testimony that the occupants of the vehicle seemed nervous. In its ruling on the motion to suppress, the trial court stated, "as far as the officers, I don't know whether it's unpreparedness or whatever, but not that they're making up anything, I want to make that clear, but based on their inability to recall what transpired, there's some credibility issues there." The trial court granted the motion to suppress, reasoning that "the traffic stop was extended *** without sufficient evidence for it to be extended and morphed into an investigation regarding the shooting." The State unsuccessfully moved to reconsider, and this appeal followed.

¶ 14                                    II. ANALYSIS

¶ 15    Motions to suppress are subject to a bifurcated standard of review. We defer to the trial court's findings of fact, reversing them only if they are against the manifest weight of the evidence. *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 8. However, we review *de novo* the trial court's legal conclusion as to whether the evidence in question must be suppressed. *Id.*

¶ 16    A defendant seeking to suppress evidence bears the initial burden of proving that the search and seizure was unlawful. *People v. Wise*, 2019 IL App (2d) 160611, ¶ 56. If the

defendant makes a *prima facie* showing that the search and seizure was unlawful, the burden shifts to the State to produce evidence justifying the intrusion. *Id.* In *Heritsch*, we summarized the following principles, which apply to this case as well:

"Although a police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense [citation], the traffic stop can become unlawful 'if it is prolonged beyond the time reasonably required to satisfy its initial purpose.' [Citation.] [In *Rodriguez v. United States*, 575 U.S. ____, ____, 135 S. Ct. 1609, 1614 (2015),] [t]he United States Supreme Court *** observed that 'the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop.' [Citation.] According to the Court, '[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.' [Citation.] In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' [Citation.] Although an officer may also conduct checks unrelated to the traffic stop's mission, 'he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " *Heritsch*, 2017 IL App (2d) 151157, ¶ 9.

An officer's mission when conducting a traffic stop includes attending to safety concerns related to the stop. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614.

¶ 17    Notably, the *Rodriguez* Court held that even a *de minimis* increase in the length of a stop is impermissible. *Id.* at ____, 135 S. Ct. at 1615-17. The State contends, *inter alia*, that "[t]he

traffic stop was not 'extended' in violation of the Fourth Amendment where the total stop, prior to the recovery of the first handgun, lasted approximately seven minutes and the officers acted diligently throughout." According to Harden, the State asks us to recognize a *de minimis* exception that would run afoul of *Rodriguez*. However, in its reply brief, the State contends that Harden has misconstrued its argument. The State maintains that it is simply arguing that, when the first handgun was discovered, the officers were still performing tasks associated with the traffic violation—speeding—that was the basis for the stop. If that is the case, the amount of time that elapsed and the officers' diligence (or lack thereof) bear on the question of whether those tasks should already have been completed before the gun was discovered.

¶ 18   When a police officer conducts a routine traffic stop, the authority to detain a motorist will normally end when the officer has prepared a ticket or a warning and delivered it to the motorist. Here, however, the trial court concluded that the authority to detain Smith and defendants ended because the stop "morphed" into an investigation of the Lake Forest shooting. Harden amplifies that point, arguing that the officers "abandoned" the stop's original mission. McKelvy similarly argues that the officers improperly extended the stop by shifting the focus of the investigation to the Lake Forest shooting. However, these theories cannot be reconciled with *People v. Harris*, 228 Ill. 2d 222 (2008), which rejected the proposition that a traffic stop becomes unreasonable when the actions of the police alter the fundamental nature of the stop. *Id.* at 244 (partially overruling *People v. Gonzalez*, 204 Ill. 2d 220 (2003)); see also *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 42.[1] The only question is whether the traffic stop was impermissibly prolonged. *Reedy*, 2015 IL App (3d) 130955, ¶¶ 41-42.

_____

[1] In light of *Harris*, we decline to follow a decision from a sister state cited by McKelvy—*Jones v. State*, 187 So. 3d 346, 348 (Fla. Dist. Ct. App. 2016)—which held that the

¶ 19    Harden insists that it is relevant that Alka's actions were guided by information acquired before he pulled the vehicle over; Alka was aware that there had been a shooting in Lake Forest and that there were reports of a possibly armed subject in a blue vehicle.  Harden acknowledges that the fourth amendment does not prohibit pretextual traffic stops.  *Whren v. United States*, 517 U.S. 806, 812-13 (1996).[2]   Harden argues, however, that this principle applies only to an officer's reasons for stopping a vehicle, not to "an officer's reasons for his decisions within a traffic stop."   (Emphasis omitted.)   Harden offers no explanation why this distinction is important, and it is not readily apparent to us why it should be.

¶ 20    Having incorrectly based its ruling on the conclusion that the traffic stop morphed into something else, the trial court failed to address the relevant issue: whether police activities unrelated to the mission of the stop prolonged it.  To answer that question, it is necessary to determine which activities were related to that mission and which were not.  After Alka stopped the vehicle, he approached it and asked Smith why he was driving so fast.  He also asked all the occupants of the vehicle for identification and ran warrant checks.  Those tasks were all tied to the purpose of the stop.[3]

---

authority to detain a motorist ended when the officer "abandoned his reason for the traffic stop."

[2] McKelvy contends that the officers here made no attempt to issue a citation or a warning and that from the outset the officers were interested in investigating the Lake Forest shooting and the report of an armed subject.  In light of *Whren*, the officers' motives have no bearing on their authority to detain Smith and defendants.

[3] Asking defendants for identification and running warrant checks were tied to the purpose of the stop even though defendants were merely passengers.  See *State v. Martinez*, 2017 UT 43, ¶¶ 16-18, 424 P.3d 83 (and cases cited therein).

¶ 21   It is less clear, however, whether ordering the occupants out of the vehicle should be considered part of the officers' mission in this case.  Ordering a driver or passenger out of a vehicle during a traffic stop is a permissible safety measure (*Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (driver); *Maryland v. Wilson*, 519 U.S. 408 (1997) (passenger)) that requires no independent justification.  Nonetheless, the *Rodriguez* Court stated, "On-scene investigation into other crimes, however, detours from [the stop's] mission.  [Citation.]  *So too do safety precautions taken in order to facilitate such detours*."  (Emphasis added.)  *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1616.

¶ 22   Here, there appears to have been ample justification for ordering the occupants out of the vehicle solely as a safety measure.  The stop occurred at 1:45 a.m., a shooting had occurred, and a vehicle with an armed subject had been spotted nearby.  Moreover, McKelvy was wearing a blue shirt, as was the armed subject, and Harden indicated that he and his companions were going to the hospital because his cousin had been shot.  Nonetheless, the trial court expressed skepticism about Alka's reasons for wanting the occupants out of the vehicle:

> "[A]s far as officer safety, I think there's always probably a worry about officers, especially in these times as far as their safety.  But *** if there were officer safety issues, it seems like that would have been something that would have been taken care of right away, not just letting them sit in the car talking on their cellphones sitting in the car if there was a true fear of guns to leave them there."

¶ 23   If Smith and defendants were ordered out of the vehicle so that the officers could investigate the shooting, it is arguable that, under *Rodriguez*, there was an impermissible detour from the mission of the stop.  We need not decide the issue, however.  Even if there were an impermissible detour, the record does not show that it prolonged the stop to the point of

illegality. The relevant question is whether, but for the detour, the mission of the stop would have been completed before the officers became aware of facts warranting continued detention. *Heritsch*, 2017 IL App (2d) 151157, ¶ 18. In other words, was the detour longer than the remaining time necessary to complete the mission of the stop had there been no detour?

¶ 24 The recording from Alka's body camera shows that approximately 80 seconds elapsed from when Smith was asked to step out of the vehicle to when Tolver discovered the gun. Completion of the stop's mission would have entailed preparing a ticket or a warning and delivering it to Smith.[4] If that would have taken more than 80 seconds, the detention was still authorized when the gun was found. Defendants could have introduced evidence to show how long it would have taken the officers to complete the stop's mission by preparing and delivering a ticket or a warning; it would have been simple enough just to ask Alka. However, defendants failed to do so, leaving us to speculate whether the mission could otherwise have been completed during the 80-second period. Accordingly, defendants failed to make a *prima facie* case of a constitutional violation, and the trial court should have denied the motion to suppress.

¶ 25                                III. CONCLUSION

¶ 26 For the foregoing reasons, the judgment of the circuit court of Lake County is reversed, and the case is remanded for further proceedings.

¶ 27 Reversed and remanded.

---

[4] Defendants stress that Alka had not yet begun writing a ticket when they were removed from the vehicle. It does not follow, however, that the stop was prolonged beyond the time necessary to complete its mission. The relevant question is not when the officers did what, but (as *Heritsch* teaches) whether the stop would have ended earlier than it actually did had there been no detour from the mission.