2025 IL App (2d) 240352
No. 2-24-0352
Opinion filed April 29, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE CITY OF LAKE FOREST, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 23-DT-1308 |
| | ) | |
| REY MARTINEZ-GALARZA, | ) | Honorable |
| | ) | Ruth H. Lofthouse, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1   Following a traffic stop, defendant, Rey Martinez-Galarza, was charged by the City of Lake Forest (City) with driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2022)). Defendant moved to quash his arrest and suppress evidence on the basis that the traffic stop leading to his arrest was unreasonably prolonged. The trial court granted the motion, and the City now appeals. We reverse and remand.

¶ 2                                I. BACKGROUND

¶ 3   Lake Forest police officer Filip Czarnecki was the only witness at the hearing on defendant's motion to quash and suppress. On direct examination by defense counsel, Czarnecki testified that on September 20, 2023, at approximately 9:45 p.m., while on routine patrol, he

observed a motor vehicle driven by defendant. The vehicle did not have an operating registration light. Czarnecki followed the vehicle for one or two minutes before pulling it over. Czarnecki described defendant's driving as "fine." Czarnecki approached the *passenger's* side of the vehicle and spoke with defendant, who was seated in the driver's seat. Czarnecki then returned to his vehicle to prepare a written warning and issue it to defendant. When he finished preparing the warning, he approached the *driver's* side of defendant's vehicle to issue the warning and return defendant's driver's license. However, without first returning defendant's license or issuing the warning, Czarnecki asked defendant a series of questions. At some point, defendant stepped out of the vehicle. Czarnecki did not ask him to do so. Czarnecki then requested assistance from a Spanish-speaking officer. After that officer arrived, defendant submitted to a series of field sobriety tests. Czarnecki ultimately arrested defendant for DUI.

¶ 4    On cross-examination by the City, Czarnecki testified that, when he approached the passenger side of defendant's vehicle after pulling it over, he asked defendant for his driver's license and proof of insurance. Instead of producing a driver's license, defendant handed Czarnecki a State of Illinois identification card. When Czarnecki approached the driver's side of defendant's vehicle after preparing the written warning, he spoke to defendant. Czarnecki testified: "On that *** approach after speaking with [defendant], I noticed the odor of an alcoholic beverage coming from his person and then also what I believed to be him—smell of a jalapeno coming from his breath." Czarnecki described the odor of alcohol as "fairly strong." Czarnecki asked defendant if he had had anything to drink. Defendant admitted drinking one or two beers at a friend's house. Defendant asked why Czarnecki had stopped him. According to Czarnecki, he reminded defendant several times that he stopped him because the registration light was not illuminated but "for whatever reason[,] [defendant] believed that it was for speeding even though [Czarnecki] never

indicated that it was for speeding." While speaking with defendant, Czarnecki noticed that defendant's speech sounded "slurred and mumbled." Defendant also had a "pretty heavy [Spanish] accent."

¶ 5    On redirect examination, Czarnecki testified that the purpose of engaging defendant in a conversation before delivering the written warning and returning his identification card was to explain the written warning to him. Czarnecki acknowledged that defendant did not ask for an explanation, but he added, "I usually do it unprompted."

¶ 6    The sole exhibit admitted during the City's case-in-chief was a video recording of Czarnecki's encounter with defendant from Czarnecki's body-worn camera. Defendant spoke somewhat broken English. According to the timestamp on the video, Czarnecki, having prepared the written warning, approached the driver's side of defendant's vehicle at 9:54:40 p.m. and said, "Alright sir, so you understand why I pulled you over, right?" Defendant responded, "Yeah," but he added, "Somebody driving in front of me is more of speed limit. You don't stop him, you stop me. I don't understand." Czarnecki explained that he did not stop defendant for speeding; he asked defendant, "Do you understand or no?" After stating that he understood, defendant remarked, "I don't know why you stop me. The people in front of me. They *** drive *** more speed limit and you no stop him, you stop me." Czarnecki explained that he stopped defendant not for speeding, but because the light designed to illuminate his license plate was out. At that point—9:55:41 p.m.—Czarnecki asked defendant if he had had anything to drink. Defendant replied that he had had one or two beers. After further conversation about defendant's consumption of alcohol, at 9:57:06 p.m., Czarnecki said, "I just want to ask because I felt like I could smell it a little bit. And now, I don't know, did you just have a jalapeno?" Defendant said that he had not. Czarnecki then asked if defendant had had "something spicy." Czarnecki remarked that he saw jalapeno peppers

on the back seat, and he asked defendant if he had just eaten one. Defendant again denied that he had. Czarnecki responded, "But I can smell it now and your tongue is a little green." Defendant offered to show Czarnecki the jalapenos. Czarnecki agreed, and defendant stepped out of the car and opened the rear driver's side door. On the back seat was a pile of green vegetables that appeared to include peppers and some leafy items. Czarnecki remarked that defendant was chewing on something and asked him what it was. Defendant responded, "Vegetables," and pointed to some of the items on the back seat. When Czarnecki asked what defendant was pointing to, defendant said he did not know what it was called.

¶ 7    In announcing its ruling, the trial court explained that there was no dispute that the initial traffic stop was lawful because Czarnecki observed an equipment violation. The court noted that, although Czarnecki testified that defendant's speech was slurred and mumbled, the court did not notice any issues with defendant's speech in the video. The court stated that, once the purpose of a traffic stop is completed, "there must be probable cause to further detain." Thus, the court framed the dispositive question as "whether or not there was probable cause to detain for driving under the influence." Concluding that "there was no probable cause to detain the defendant past the point of the initial stop," the court granted defendant's motion to quash and suppress.

¶ 8    The City moved to reconsider. In denying the motion, the trial court stated:

"In this case the officer was uncertain after a minute of conversation with the defendant after he had returned to [defendant's] vehicle with the citation if he smelled alcohol or peppers. It was not immediately apparent to him. It was not plain. *** [A]s his questions concerning the odor of alcohol after the conclusion of the stop failed to rise to a level of reasonable suspicion ***, they did not authorize the continued detention of the defendant."

This appeal followed.

¶ 9                                    II. ANALYSIS

¶ 10    The standard of review applicable to a trial court's ruling on a motion to quash an arrest and suppress evidence is bifurcated: findings of fact and credibility determinations will not be disturbed unless against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate legal ruling on whether to grant the motion. *People v. Hui*, 2022 IL App (2d) 190846, ¶ 15.

¶ 11    As we have observed,

> "[t]here are three tiers of police-citizen encounters: (1) an arrest of a citizen, which must be supported by probable cause; (2) a temporary investigatory seizure conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), where an officer may conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity and such suspicion amounts to more than a mere 'hunch'; and (3) police-citizen encounters that are consensual, which involve no coercion or detention and do not implicate any fourth amendment [(U.S. Const., amend. IV)] interests." *People v. Bianca*, 2017 IL App (2d) 160608, ¶ 13.

¶ 12    A traffic stop is considered more analogous to a temporary investigative seizure (*i.e.*, a *Terry* stop) than to a formal arrest. *People v. Maberry*, 2015 IL App (2d) 150341, ¶ 10. Concerning the permissible duration of a traffic stop, we have explained that

> "[t]he traffic stop can become unlawful 'if it is prolonged beyond the time reasonably required to satisfy its initial purpose' [citation]. The United States Supreme Court has observed that 'the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the

stop.' *Rodriguez v. United States*, 575 U.S. [348, 354] (2015). According to the Court, '[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.' *Id.*[ ]. In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.' [Citation.] Although an officer may also conduct checks unrelated to the traffic stop's mission, 'he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.' " *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 9.

Moreover, "[w]hile reasonableness requires diligence in completing a traffic stop, it does not require inhuman, machine-like efficiency, such that the traffic stop is completed as fast as possible, down to the second." *People v. Drain*, 2023 IL App (4th) 210355, ¶ 48.

¶ 13    Although detention ordinarily must end when the purpose of the traffic stop has been completed, it may be extended if, before the tasks associated with the stop are completed, the officer develops a reasonable suspicion that a different crime has been or is being committed. *People v. Patel*, 2020 IL App (4th) 190917, ¶ 16. The strong odor of alcohol emanating from a motorist during a traffic stop, coupled with the motorist's admission to consuming alcohol, gives rise to a reasonable suspicion that the motorist committed DUI. See *Village of Lincolnshire v. Kelly*, 389 Ill. App. 3d 881, 886-87 (2009). Indeed, in *People v. Bruni*, 406 Ill. App. 3d 165, 170-71 (2010), we cited, with approval, cases from other jurisdictions holding that the odor of alcohol is sufficient in itself to create a reasonable suspicion. In one such case, *People v. Rizzo*, 622 N.W.2d 319, 321 (Mich. Ct. App. 2000), the defendant was stopped, as was defendant here, solely for an

equipment violation. The *Rizzo* court held that, when the officer detected the "strong odor of intoxicants on [the] defendant's breath," he had a reasonable suspicion that the defendant had been driving under the influence of alcohol, regardless of the existence of other indicia of intoxication. *Id.* Here, according to Czarnecki, defendant's breath had the odor of alcohol, *and* he admitted having consumed one or two beers. Thus, Czarnecki had reasonable suspicion that defendant had committed DUI; the dispositive question is whether that suspicion arose while defendant was still properly detained.

¶ 14    The City argues that the trial court erred in concluding that Czarnecki's conversation with defendant, *after* completing the written warning but *before* delivering it to defendant and returning his identification card, improperly prolonged the stop. Defendant argues in response that the purpose of the stop was completed when Czarnecki returned to defendant's vehicle with the written warning. According to defendant, Czarnecki thereafter improperly prolonged the stop by questioning defendant to ensure that he understood what the warning was for. We agree with the City.

¶ 15    As noted, the officer's mission in a traffic stop includes checking the motorist's license and conducting a warrant search. See *Heritsch*, 2017 IL App (2d) 151157, ¶ 9. Illinois courts have held that, once these tasks have been completed, " 'if no further suspicion is aroused, the traffic stop must cease, and the individual should no longer be detained.' [Citation.] The police officer should then issue a warning ticket and allow the driver to continue on his way." *People v. Ramsey*, 362 Ill. App. 3d 610, 615 (2005); see *People v. Miller*, 345 Ill. App. 3d 836, 842 (2004). The question that remains, however, is precisely what activities fall within the scope of "issuing" a written warning. Must the officer simply deliver the warning and tell the motorist that he is free to go? Or does the task of issuing a written warning include attempting to ensure that the motorist

understands the warning? We have found no Illinois decision specifically addressing this issue, but courts in other jurisdictions generally appear to favor the latter view. See, *e.g.*, *State v. Furtch*, 890 S.E.2d 173, 181-82 (N.C. Ct. App. 2023) (although unrelated to the mission of the traffic stop, a free air sniff by a drug detection dog did not prolong the stop because the sniff occurred while the officer was explaining a warning ticket for improper lane usage and following too closely); *State v. Galindo*, 522 P.3d 1284, 1287-88 (Idaho Ct. App. 2022) ("A traffic stop's purpose to cite a driver for a traffic violation is not complete simply when the officer prints the citation. Rather, serving the citation and the accompanying tasks of returning the driver's documentation and explaining the citation are necessary to complete the traffic stop's purpose."); *United States v. Wilson*, 662 F. App'x 693, 696 (11th Cir. 2016) (*per curiam*) ("When an officer issues a warning citation during a traffic stop, the stop is not unreasonably prolonged if the officer takes time to explain the citation to the motorist.").

¶ 16     We agree with those courts that have held that explaining a written warning to a motorist is a proper part of the process of issuing the warning. In *Rodriguez*, the United States Supreme Court explained that the ordinary inquiries incident to a traffic stop (*i.e.*, checking the motorist's license and proof of insurance, the vehicle's registration, and the existence of any warrants for the motorist's arrest) "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). As a court in a sister state has observed, "[t]he act of explaining to a vehicle owner, who was present at a traffic stop, that [his] vehicle did not comply with legal requirements falls within this objective." *Flores v. State*, 818 S.E.2d 90, 93 (Ga. Ct. App. 2018). Here, it was appropriate for Czarnecki to attempt to ensure that defendant understood that the inoperative

registration light on his vehicle violated legal requirements, thus alerting defendant to the need for bringing the vehicle into compliance.

¶ 17    We are aware that at least one court has rejected the proposition that an officer who has conducted a traffic stop may detain a motorist while explaining a written warning. In *Mills v. State*, 2020 WY 14, ¶ 28, 458 P.3d 1, 11 (Wyo. 2020), the Supreme Court of Wyoming held that the completion of a warning citation by the officer who conducted the traffic stop "demonstrate[d] that [the officer] had the time reasonably required to complete the purposes of the traffic stop." The court "decline[d] to hold that [the officer's] purported desire to 'explain' the warning citation after he completed it was related to the purpose of the traffic stop in these circumstances." *Id.* The court reasoned that "[a] conclusion to the contrary would permit law enforcement to retain a citation and documents indefinitely in order to extend a stop that reasonably ought to have been completed." *Id.* We disagree. Courts are fully capable of determining whether an officer's explanation for a written warning is unreasonably delayed or protracted, thereby guarding against the sort of mischief the *Mills* court described.

¶ 18    Applying these principles here, we note that, when Czarnecki returned to defendant's vehicle after preparing the written warning, he initiated a discussion about the reason for the warning. The discussion lasted roughly one minute, during which defendant questioned why Czarnecki stopped him when he was not speeding, while others on the road were. This was a reasonable amount of time for Czarnecki to attempt to convey to defendant that the warning was for an equipment violation, not a moving violation. Doing so served the salutary purpose of enabling defendant to bring his vehicle into compliance with the law. Immediately after trying to explain the reason for the warning, Czarnecki asked defendant if he had had anything to drink. According to Czarnecki's testimony, he did so because he noticed the strong odor of alcohol

coming from defendant's person. Given the sequence of events, it is evident that Czarnecki noticed the odor of alcohol while attempting to explain the reason for the warning. At that point, the mission of the original stop had not been completed.

¶ 19 We note that, in denying the City's motion to reconsider, the trial court remarked that, after preparing the written warning and speaking with defendant for a minute, Czarnecki was uncertain if he smelled alcohol or peppers. Regardless of whether Czarnecki had any doubt about smelling peppers, he expressed no doubt in either his testimony or his video-recorded encounter with defendant about smelling alcohol. Accordingly, the trial court's finding is against the manifest weight of the evidence.[1] We therefore conclude that the trial court erred in granting defendant's motion to quash and suppress.

¶ 20                                  III. CONCLUSION

¶ 21 For the reasons stated, we reverse the judgment of the circuit court of Lake County and remand for further proceedings.

¶ 22 Reversed and remanded.

---

[1]During the stop, Czarnecki said to defendant, "I just want to ask [(about alcohol consumption)] because I felt like I could smell it a little bit. And now, *I don't know*, did you just have a jalapeno?" (Emphasis added.) Perhaps the trial court understood the words "I don't know" as reflecting doubt as to whether Czarnecki smelled alcohol. In our view however, they either were filler words or reflected doubt about what Czarnecki smelled *in addition* to alcohol.

*City of Lake Forest v. Martinez-Galarza*, **2025 IL App (2d) 240352**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 23-DT-1308; the Hon. Ruth H. Lofthouse, Judge, presiding. |
| **Attorneys for Appellant:** | Lawrence R. LaLuzerne, of LaLuzerne & Smith, Ltd., of Waukegan, for appellant. |
| **Attorneys for Appellee:** | Lyle S. Cohen, of Highwood, for appellee. |