2021 IL App (4th) 190103

FILED
January 26, 2021
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| JOHNNIE W. KADOW, | ) | No. 17CF644 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert K. Adrian, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Presiding Justice Knecht concurred in the judgment and opinion.
Justice Turner dissented, with opinion.

**OPINION**

¶ 1        In August 2017, the State charged defendant, Johnnie W. Kadow, with five counts

of predatory criminal sexual assault of a child, Class X felonies. 720 ILCS 5/11-1.40(a)(1), (b)(1)

(West 2016). In October 2018, defendant moved to suppress statements he made during a recorded

interview, claiming he did not knowingly and voluntarily waive his *Miranda* rights (see *Miranda*

*v. Arizona*, 384 U.S. 436 (1966)). Following a November 2018 evidentiary hearing, the trial court

took the matter under advisement and invited the parties to submit memoranda of law in support

of their positions. In December 2018, the trial court denied defendant's motion to suppress, finding

defendant reinitiated contact with the officer after invoking his right to counsel and then knowingly

and voluntarily waived his *Miranda* rights. As a result, the court concluded the State could

introduce defendant's statements into evidence as corroboration of the minor victims' hearsay

statements, which the court previously found admissible under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)). In February 2019, the court held a hearing on defendant's posttrial motion, which alleged the trial court's denial of his motion to suppress was error. In denying defendant's posttrial motion, the trial court again noted defendant asserted his rights, but then made a knowing and voluntary waiver of his *Miranda* rights.

¶ 2        On appeal, under the umbrella of a claim of ineffective assistance of counsel, defendant argues (1) defendant's intellectual disability rendered his statement involuntary, (2) the police undermined defendant's *Miranda* warnings by failing to respect defendant's invocation of counsel, (3) defendant's will was overcome by the officer's threats of jail and offers to help defendant were conditioned on defendant's confession, and (4) based on the aforementioned errors, defendant's statement was involuntary and unreliable. Defendant claims trial counsel was ineffective for failing to seek to suppress defendant's statements on the grounds that the statements were involuntary. The State argues trial counsel was not ineffective because the evidence showed defendant gave a voluntary statement and, after invoking his right to counsel, he initiated contact with the police officer. The State claims after defendant initiated contact with the officer, he then voluntarily waived his *Miranda* rights. Because we agree with defendant that the police undermined defendant's *Miranda* warnings by initiating contact after defendant's invocation of counsel, and because he was incapable of understanding, much less voluntarily waiving, his *Miranda* rights, we reverse and remand.

¶ 3                                I. BACKGROUND

¶ 4        In August 2017, the State charged defendant by information with five counts of predatory criminal sexual assault of a child, Class X felonies. 720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2016).

¶ 5        In October 2017, the State filed a motion *in limine* requesting to admit hearsay statements made by the two minor victims, pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)). That same month, defense counsel filed a "Suggestion of Fitness and Motion for Examination," questioning whether defendant was fit to stand trial because defendant "cannot read or write and seems unable to understand the legal process and possible consequences."

¶ 6        In November 2017, Dr. Frank Froman, a clinical psychologist, submitted a fitness report indicating defendant reads at a kindergarten level, his perceptual motor abilities are akin to a five-year-old child, he functions at a third-grade level, and he could not comprehend his legal rights—neither what they are, nor what they mean. Dr. Froman concluded defendant's "condition is fixed, and unlikely to change his [*sic*] result of any form or therapy, medication, or the like. His condition is essentially immutable." Dr. Froman found defendant incapable of "understanding the charges against him, and cooperating with his attorney in formulating his defense." After finding defendant unfit to stand trial, the court ordered he be placed in the custody of the Illinois Department of Human Services (DHS) for evaluation to determine his fitness status and whether he can be made fit within one year.

¶ 7        In May 2018, DHS filed a "Progress Report," pursuant to section 104-18(a)(3) (725 ILCS 5/104-18(a)(3) (West 2016)), which stated defendant did not have the capacity to meet the standard of legal fitness because,

> "[h]is thought process consists primarily of simplistic concrete
> concepts (as opposed to abstract ideas), and his learning process
> consists primarily of rote memorization acquired through repetition
> over time. Consequently, his ability to adequately understand the

legal proceedings against him is severely compromised, and he does not have the skills necessary to effectively participate in his own defense."

The report concluded defendant was unlikely to ever attain legal fitness. The findings of this report were consistent with each of the progress reports filed with the court. Based on this, defense counsel filed a motion for a discharge hearing pursuant to section 104-25 (725 ILCS 5/104-25 (West 2016)) of the Code. See 725 ILCS 5/104-23 (West 2016) (authorizing a discharge hearing where an unfit defendant cannot become fit to stand trial because there is a substantial probability that he will not attain fitness within the allotted time period).

¶ 8　　　　In October 2018, the trial court held a hearing pursuant to section 115-10(b) of the Code (725 ILCS 5/115-10(b) (West 2016)) to determine the admissibility of the minor victims' hearsay statements. The minors' mother and grandmother testified about the statements the minors made to them regarding the allegations. The State also presented evidence from the director of forensic interviewing of the Children's Advocacy Center about her recorded interview with both minors, from a social worker who counseled both minors, and from Detective Hufford's interview of defendant. The court found the statements the minors made to their mother and grandmother were reliable, but if the children were found to be unavailable to testify, then the State was required to present corroborating evidence in order for the court to admit them. The corroborating evidence would be defendant's recorded interview and eventual admission of guilt. On the same day as the hearing, defense counsel filed a motion to suppress the statements defendant made to Detective Hufford, claiming that, due to his learning disability, he was unable to understand and comprehend his *Miranda* rights and was therefore unable to make a knowing and voluntary waiver of those

rights. The court reserved ruling on whether the minors would be declared unavailable until it ruled on defendant's motion to suppress.

¶ 9        In November 2018, the trial court heard defendant's motion to suppress. The evidence consisted of the recorded interview of defendant and prior reports authored by mental health professionals concerning defendant's fitness. During the interview, Detective Hufford read defendant's *Miranda* rights, and defendant confirmed he understood them. Hufford reviewed the admonition form with defendant; however, after admitting he could not write, defendant said he did not understand the meaning of his rights, and Hufford attempted to explain them to him in simpler terms. Detective Hufford had to explain the practical application of defendant's *Miranda* rights before defendant signed the admonition form. After denying the allegations, the following dialogue took place:

> "DEFENDANT: Can I talk to a lawyer?
>
> DETECTIVE HUFFORD: Huh?
>
> DEFENDANT: Can I talk to a lawyer?
>
> DETECTIVE HUFFORD: You want a lawyer? I am going to call to see if the State's Attorney's Office wants you to be lodged in jail right now, okay? If you don't want to talk to me.
>
> DEFENDANT: I'll talk to you.
>
> DETECTIVE HUFFORD: No.
>
> DEFENDANT: I'll talk to you.
>
> DETECTIVE HUFFORD: I don't think you're being honest with me already.
>
> DEFENDANT: Yeah, I was out of town. I want to talk to you.

DETECTIVE HUFFORD: (while exiting the room) Remain seated.

DEFENDANT: I'll talk to you, please."

Detective Hufford responded, "You just said you wanted a lawyer that means I have to stop. Unless you really want to talk to me." Defendant then reiterated he wanted to speak with him and confirmed he did not want an attorney. Hufford, in the presence of another detective, read defendant his *Miranda* rights again, where defendant (again) exhibited difficulty in understanding them. After approximately 40 minutes of denying the allegations and listening to Hufford's repeated demands for honesty, offers of help, and threats of jail, defendant eventually admitted to sexually abusing the two minors. At the conclusion of the hearing, the court took the matter under advisement.

¶ 10    In December 2018, the court found defendant's statements to the police were made knowingly and voluntarily, and defendant understood his *Miranda* rights because he invoked his right to an attorney after being questioned by Detective Hufford. The court reasoned defendant reinitiated the interrogation by saying he wanted to talk after Hufford said he would have to contact the state's attorney's office about putting defendant in jail. Hufford Mirandized him again, and "although [defendant] was unable to basically tell the officers what [his rights] were in full, he stated he understood those." The trial court acknowledged that "while [defendant] does have limitations, he is able to function. He knew what his rights were. He invoked his rights. And then once he invoked his rights, then he again waived his rights."

¶ 11    Later that month, the trial court held a discharge hearing where the court heard testimony from the minors' mother and grandmother and reviewed defendant's recorded interview. At the conclusion of evidence, the court found the State presented sufficient evidence to find

defendant "not not guilty" on all counts and remanded defendant to DHS for up to an additional two years.

¶ 12    This appeal followed.

¶ 13                                II. ANALYSIS

¶ 14                                A. Plain Error

¶ 15    Although initially argued under the umbrella of ineffective assistance of counsel, defendant's reply brief contends we should consider defendant's *Miranda* violation under the plain error doctrine. In *People v. White*, 2011 IL 109689, ¶ 133, 956 N.E.2d 379, our supreme court noted, "Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced ***." Because we believe this *Miranda* violation prejudiced defendant and the evidence was closely balanced, we accept defendant's invitation to analyze this issue as plain error.

¶ 16    We first note plain error was not argued in defendant's opening brief and, as a result, the State has not had the opportunity to argue forfeiture. Although the better practice would have been to raise the plain error arguments in his opening brief, our supreme court has told us we may still conduct a plain error analysis even if it was raised for the first time in an appellant's reply brief. See *People v. Ramsey*, 239 Ill. 2d 342, 412, 942 N.E.2d 1168, 1206 (2010) (When defendant fails to argue plain error in his opening brief, a court of review may still review the issue for plain error if argued in his reply brief.).

¶ 17    While defendant argued to the trial court his statement was not made voluntarily due to his intellectual disability, trial counsel never argued defendant's statement should be suppressed because Detective Hufford violated *Miranda* by failing to honor defendant's request

for counsel. Since defendant did not raise this issue with the trial court, we would normally find he forfeited appellate review of this issue. See *People v. Piatkowski*, 225 Ill. 2d 551, 564, 870 N.E.2d 403, 409 (2007). However, Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."

¶ 18  "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565.

First-prong plain error is established by demonstrating "prejudicial error," *i.e.*, because the evidence was so closely balanced, "the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. Prejudice is not presumed; a defendant must meet his burden to show the error was actually prejudicial. *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 479-80 (2005). By contrast, under the second prong, prejudice is presumed because of the importance of the right involved, irrespective of the strength of the evidence. *People v. Fort*, 2017 IL 118966, ¶ 18, 88 N.E.3d 718. However, if error did occur, we only need to consider if one of the prongs of the plain error doctrine has been satisfied. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31, 972 N.E.2d 1272. The first step in any plain error analysis is determining "whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49.

Accordingly, we must first determine whether the trial court erred by admitting defendant's recorded statement after defendant's request for counsel.

¶ 19            B. Violating *Miranda* Renders Defendant's Statements Involuntary

¶ 20            On appeal, defendant argues (1) defendant's intellectual disability rendered his statement involuntary, (2) the police undermined defendant's *Miranda* warnings by failing to respect defendant's invocation of counsel, (3) defendant's will was overcome by the officer's threats of jail and offers to help defendant were conditioned on defendant's confession, and (4) based on the aforementioned errors, defendant's statement was involuntary, unreliable, and inadmissible. We agree defendant's statement was inadmissible on two grounds: (1) Hufford undermined his *Miranda* rights by initiating contact after defendant asked for counsel and (2) defendant's intellectual disability rendered him incapable of voluntarily waiving his *Miranda* rights. The two are somewhat intertwined, since defendant's intellectual disability is a significant factor among those considered when determining the effect of a *Miranda* violation in this case.

¶ 21            "The purpose of [*Miranda* warnings] is to ensure that the accused is aware of his substantive constitutional right not to incriminate himself and to provide him with the opportunity to exercise that right." *People v. Winsett*, 153 Ill. 2d 335, 348, 606 N.E.2d 1186, 1194 (1992). The importance of safeguarding this substantial right is paramount, and a violation of it impairs the integrity of the judicial process. *Herron*, 215 Ill. 2d at 177-78. In *Miranda*, the United States Supreme Court held when an accused invokes his right to counsel, "*the interrogation must cease until an attorney is present.*" (Emphasis added.) *Miranda*, 384 U.S. at 474. The United States Supreme Court further held that when a suspect expresses a desire to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or

conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The Illinois Supreme Court interpreted the *Edwards* holding to mean that "[i]f the police subsequently initiate a conversation with the accused in the absence of counsel, the accused's statements are presumed involuntary and are not admissible as substantive evidence at trial." *People v. Woolley*, 178 Ill. 2d 175, 198, 687 N.E.2d 979, 990 (1997). As we noted in *People v. Peck*, 2017 IL App (4th) 160410, ¶ 33, 79 N.E.3d 232, once defendant invokes his right to counsel, we look to the "words or actions" of the police "that [they] should know are reasonably likely to elicit an incriminating response from the suspect." (Emphases and internal quotation marks omitted.) This focus, the court said in *Hunt*, is because " '*Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.' " *People v. Hunt*, 2012 IL 111089, ¶ 30 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). "The court's preliminary inquiry is whether the defendant, rather than the police, initiated the conversation in a manner evincing a 'willingness and a desire for a generalized discussion about the investigation.' " *People v. Olivera*, 164 Ill. 2d 382, 390, 647 N.E.2d 926, 930 (1995) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)).

¶ 22       When a defendant moves to suppress evidence claiming a violation of *Miranda* rights, there is a two-part analysis. *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006). We first examine whether the trial court's factual findings are against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542. However, a court of review is permitted to undertake its own assessment of the facts and draw its own conclusions when deciding what relief, if any, should be granted. *People v. Pitman*, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 101 (2004). Next, we review *de novo* the trial court's ruling regarding the motion to suppress. *People v. Harris*, 228 Ill. 2d 222, 230, 886 N.E.2d 947, 954 (2008). Where, as here, we are asked to determine whether

a suspect has initiated further communication in the absence of counsel, an additional two-part inquiry is necessary: (1) whether the accused, after invoking his right to counsel, initiated further conversation evincing a willingness and desire for a generalized discussion about the investigation and (2) whether the accused has subsequently knowingly and intelligently waived his right to counsel and his right to remain silent. *Bradshaw*, 462 U.S. at 1045-46; *Woolley*, 178 Ill. 2d at 198-99.

¶ 23     It is undisputed defendant is intellectually disabled. Dr. Froman found him to have a functional intelligence quotient (IQ) of 56, which placed him in the "mid-mild range of intellectual dysfunction." He was unable to read beyond a kindergarten level and had the perceptual motor skills of a five-year-old child. Dr. Froman concluded he could answer "extremely simple questions, of the kind that you would typically give to an eight-year-old child." His overall functioning was at a third-grade level. Dr. Froman described him as "a somewhat sheepish, very minimal, and intellectually pauce [(deficient)] individual whose ability to understand, comprehend, and make sense of his world is quite low." Dr. Froman also found defendant's condition to be "immutable," meaning it was not likely to change over time. This was borne out by the several progress reports noting his condition did not change and he seemed no more able to comprehend his rights or the process. After he was found unfit to stand trial and sent to DHS, he underwent further psychological testing and assessment of his adaptive functioning. DHS found him to have an even lower IQ of 50, but because severity classifications are based on adaptive functioning, his level of adaptive functioning (the age equivalent of nine years, eight months) placed him in the range for a mild intellectual disability diagnosis. According to the DHS evaluation, 99.9% of people his age would score higher than he did intellectually. DHS highlighted the fact that "[t]his is an extremely low level of intellectual functioning" and concluded that the

defendant was unlikely to ever attain legal fitness. The latest 90-day progress report in the court file, dated February 25, 2019—a year after his admission—revealed that although defendant was actively engaged in the Legal Fitness Restoration Program and "wants to participate appropriately," "[d]ue to the severity of [his] cognitive impairment," "[defendant] simply does not have the cognitive capacity to learn the material covered in the class." As the authoring psychologist, Dr. Holt, put it, "[e]ffective communication with [defendant] requires interaction as though working with a very young child." She indicated defendant was unlikely to "ever attain more than a very superficial understanding of the judicial process." He never passed the class he was taking to attempt to attain fitness, and Dr. Holt ultimately concluded he was "unlikely to ever attain Legal Fitness."

¶ 24       Although the investigating officer did not have access to the various mental health reports later available to the trial court, defendant's disability was evident to Detective Hufford, the interviewing officer, and is obvious from viewing the video-recorded interview. Defendant told Hufford he could not read and struggled to understand the application of his *Miranda* rights. Initially, defendant simply responded affirmatively after each right was read to him. Once he told Hufford he could not read and the officer began going over each right again, defendant told him he did not understand. Hufford then began attempting to explain each right in simpler terms. Defendant has a speech impediment (one report indicated "public defender" was pronounced "pubber fender"), which is obvious on the video, and his physical features and mannerisms further highlight his cognitive deficits. Dr. Froman noted he could write his name only with difficulty and that is apparent from the video. These things had to be obvious to the detective because they are painfully obvious to even a casual observer of the video. During the interrogation, although defendant eventually said he understood his *Miranda* rights, he was unable to explain what they

are and how they apply to him. This is consistent with the reports of the mental health experts at Choate and the initial fitness evaluation, all of which concluded defendant did not have the capacity to understand his rights or the legal concepts involved. While it is true the detective was never questioned about his perception of defendant's ability to understand the *Miranda* warnings, it should be noted he only testified at the section 115-10 hearing, where the defendant's understanding would not have been relevant, and the discharge hearing, which occurred after defendant had already lost his motion to suppress on that issue.

¶ 25 Shortly after the officer began questioning defendant about the allegations and claimed defendant was not being honest, defendant stated, "Can I talk to a lawyer?" Detective Hufford responded, "Huh?" and defendant repeated his request, "Can I talk to a lawyer?" At this moment, defendant twice unambiguously requested counsel, and any further questioning by the officer at this point should have ceased. *Miranda*, 384 U.S. at 474 (stating when an accused invokes this right to counsel, "the interrogation must cease until an attorney is present"). In response to defendant's request for counsel, the detective responded, "You want a lawyer?" After a brief pause, he tells defendant, "I am going to call to see if the State's Attorney's Office wants you lodged in jail right now, okay? If you don't want to talk to me." It is important to note that after defendant requested counsel, *he did not initiate contact* with the detective nor demonstrate a willingness to speak with him about the allegations. It was *the detective who initiated the contact* and did so with a statement implying jail was a consequence of defendant's decision to ask for an attorney, *unless* defendant talked to him. This is violative of *Miranda* and *Edwards* in that the clear import of Hufford's comment, especially to someone of defendant's limited intellectual abilities, was that the only way he could avoid the possibility of being "lodged in jail" was to give up his right to counsel and talk to the officer.

¶ 26        As we note below when addressing the issue of the voluntariness of defendant's statement in general,

> " 'it is generally recognized that the [intellectually disabled] are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights.' " *People v. Brown*, 2012 IL App (1st) 091940, ¶ 38, 967 N.E.2d 1004 (quoting *People v. Braggs*, 209 Ill. 2d 492, 514, 810 N.E.2d 472, 486 (2003)).

If defendant is incapable of understanding his rights in the first place, as all evidence indicated, how can he possibly knowingly waive them once confronted with the option of talking or jail? "To be valid, the waiver must reflect an intentional relinquishment or abandonment of a known right or privilege. The accused must possess a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *In re W.C.*, 167 Ill. 2d 307, 327-28, 657 N.E.2d 908, 919 (1995). In *W.C.*, our supreme court pointed out that, although evidence of a mental deficiency may not *ipso facto* render a *Miranda* waiver invalid, "it is nonetheless a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession given." *W.C.*, 167 Ill. 2d at 328.

¶ 27        The State claims the interaction here between defendant and Hufford is analogous to that in *People v. Enoch*, 122 Ill. 2d 176, 192-93, 522 N.E.2d 1124, 1132-33 (1988), claiming the officer's statement after defendant invoked his right to counsel was merely an explanation of what normal police procedure would take place next and not designed to elicit anything. However, putting aside that *Enoch* does not involve a defendant with this defendant's cognitive deficiencies,

this was not an explanation of what was about to happen procedurally as in *Enoch*, *i.e.*, informing defendant he was going to be arrested on the charges of aggravated sexual abuse of a child and booked into jail. This was a not-so-thinly veiled threat made to an intellectually disabled individual, indicating that unless defendant cooperated and talked to the investigating officer, he may have to "be lodged in jail." Hufford expressly connected defendant's refusal to talk and request for a lawyer with further incarceration. Unlike in *Enoch*, Hufford did not simply explain the procedure; he conditioned the defendant's incarceration on his not talking to him. The only conceivable purpose for the detective's statement was to threaten the prospect of incarceration in the hope defendant would retract his request for counsel and possibly provide an incriminating statement. The fact that defendant is then seen on the video pleading with Hufford to talk is all the more evidence of the manipulative effect of his words on a suspect with such severe developmental disabilities. We recognize police are provided latitude in the questioning of a suspect. See *People v. House*, 141 Ill. 2d 323, 375, 566 N.E.2d 259, 282 (1990). However, once a suspect unambiguously invokes his right to counsel, the police are not entitled to make statements designed to pressure defendant to retract his request for counsel—they are required to cease the interrogation until defendant's attorney is present. *Edwards*, 451 U.S. at 484-85; see also *Winsett*, 153 Ill. 2d at 350 ("Any waiver of the right to counsel given in a discussion initiated by the police is presumed invalid ***.").

¶ 28        The defendant's comment, "I'll talk to you," after being advised Hufford is going to talk to the state's attorney about jailing him "[i]f you don't want to talk to me," was not "a statement that evinces a 'willingness and a desire for a generalized discussion about the investigation,' " especially coming from someone with defendant's cognitive deficits. *Woolley*, 178 Ill. 2d at 198 (quoting *Bradshaw*, 462 U.S. at 1045-46). All the reports noted defendant's lack

of any sort of abstract thought process and that his thinking was in the most concrete of terms. His statement was in direct response to Hufford's last comment about what was going to happen "[i]f you don't want to talk to me." Here, Detective Hufford was obligated to stop talking to defendant after defendant requested (twice) to speak with a lawyer. Accordingly, we find it was error for the trial court to deny defendant's motion to suppress because defendant's statement was involuntary. After a clear and unequivocal exercise of his right to counsel, he was not subject to further interrogation by the police until counsel was made available to him. *Edwards*, 451 U.S. at 484-85.

¶ 29    Thus, the trial court's factual finding that defendant's statements were knowingly and voluntarily waived is against the manifest weight of the evidence. *Luedemann*, 222 Ill. 2d at 542. Because the detective reinitiated the contact after defendant invoked his right to counsel, defendant's statements are involuntary and inadmissible. *Woolley*, 178 Ill. 2d at 198.

¶ 30    C. Defendant Did Not Voluntarily Waive *Miranda*

¶ 31    Defendant contends any waiver of *Miranda* rights by him could not have been voluntary because he was not able to understand them. " 'The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination ***.' " *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 43 (quoting *Braggs*, 209 Ill. 2d at 505). Our supreme court has also upheld the longstanding principle that whether a defendant made a knowing and intelligent waiver of his rights is determined by the particular facts and circumstances of each case, which includes the " 'background, experience, and conduct of the accused.' " *Braggs*, 209 Ill. 2d at 515 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Limited intellectual capacity is one of several factors to be considered to determine if a defendant was incapable of waiving *Miranda* rights. *People v. Foster*, 168 Ill. 2d 465, 476, 660 N.E.2d 951, 956 (1995). As we noted above, when the defendant has limited mental capacity, particular

attention must be given to this fact. Although an intellectual deficit does not, by itself, render a *Miranda* waiver invalid, our supreme court in *Braggs* discussed the special care necessary with individuals with developmental disabilities:

> "[I]t is generally recognized that the [intellectually disabled] are considered more susceptible to police coercion or pressure than people of normal intellectual ability, they are predisposed to answer questions so as to please the questioner rather than to answer accurately, they are more likely to confess to crimes they did not commit, they tend to be submissive, and they are less likely to understand their rights." *Braggs*, 209 Ill. 2d at 514.

While the facts of *Braggs* may be dissimilar, the principles of law and observations about the unique issues involved when relating to persons with intellectual disabilities remain the same. Nothing about the language of the Supreme Court's analysis in *Braggs* would imply its holdings were limited to the facts of the case.

¶ 32 Unlike many cases where we must glean from the circumstances a defendant's ability to understand and waive voluntarily his or her *Miranda* rights, here we have experts documenting his inability to do so. As part of the analysis above, we outlined the substantial record of defendant's cognitive deficits. According to the fitness reports, defendant is a 36-year-old man who reads at a kindergarten level, has motor skills comparable to a five-year-old, and has an IQ of 56, later tested at 50, which places him in the range of having "mid-mild range of intellectual dysfunction." He functions at the lowest 1% of the population intellectually. His overall ability to function is equivalent to a third-grader and, according to the examining psychologist, "his understanding of himself, of the world, of interactions, and the law, [are] no greater than that of a

typical eight-year-old child." Dr. Froman indicated a discussion of defendant's rights revealed, "[w]hile he did not recall if he understood them, nor if they were read to him, it seemed clear after going through them that he does not understand what they are, nor what they mean." The report indicates "he is extremely dependent upon his external environment (*i.e.*, prompts/supervision from others) to ensure the safety of self and others."

¶ 33 During the interview, defendant appears scared and confused and responds mostly with one-word answers. After defendant asks for a lawyer, and the detective informs him he is going to contact the state's attorney's office to see if they want defendant to be "lodged in jail," defendant appears visibly scared, leans forward in his chair, and says he wants to talk. As Detective Hufford is leaving the room, defendant responds, "I will talk to you, please." In *Braggs*, our supreme court noted the myriad issues that are involved in questioning people who are intellectually disabled. *Braggs*, 209 Ill. 2d at 514. In *Wilson*, 2020 IL App (1st) 162430, ¶ 48, the First District observed that our courts have normally described "mental retardation" (now "intellectual disability") as persons with an IQ of less than 70 (*People v. Daniels*, 391 Ill. App. 3d 750, 754, 908 N.E.2d 1104, 1107 (2009)) or 75 (*People v. Jones*, 2014 IL App (1st) 120927, ¶ 59, 8 N.E.3d 470; *In re S.W.N.*, 2016 IL App (3d) 160080, ¶ 73, 58 N.E.3d 877). Here, we are dealing with an individual with a functional IQ of 50, who "requires interaction as though working with a very young child." The obligation of the State to prove that a waiver was knowing and intelligent was described by the *Miranda* court as a "heavy burden." *Miranda*, 384 U.S. at 475. Courts are to "indulge every reasonable presumption against waiver of fundamental constitutional rights." (Internal quotation marks omitted.) *Zerbst*, 304 U.S. at 464. Here, the trial court was asked to find that defendant, after being threatened with jail, was fully aware of the nature of the rights he waived and the ramifications of such decision. The fitness report and the status reports from Choate clearly

reveal he never fully understood his rights and was equally unable to comprehend the ramifications of a waiver.

¶ 34        Defendant's background, experience, and conduct reveal he was unable to voluntarily waive his *Miranda* rights. See *Braggs*, 209 Ill. 2d at 515. Because the issue of defendant's involuntary waiver due to his intellectual disability was raised in the trial court, we need not conduct a plain error analysis. Instead, we simply find defendant was incapable of waiving his *Miranda* rights and it was error to deny defendant's motion to suppress.

¶ 35        Having found it was clear and obvious error to deny defendant's motion to suppress based on Detective Hufford's *Miranda* violation and that it was cognizable under first-prong plain error, we must determine whether the error was prejudicial error, *i.e.*, because the evidence was so closely balanced, "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. Defendant's statement to the police was the *only* corroboration supporting the victims' hearsay statements. During the section 115-10 hearing, the trial court, when discussing the potential unavailability of the child-victims, noted defendant's statement might constitute the corroboration necessary. The only question in the court's mind was whether defendant's statement would still be available for corroboration if it was found inadmissible at the suppression hearing. Without defendant's recorded statement, the victims' hearsay statements were not admissible if they proved unavailable, and the State would have had no other evidence to present. The court eventually found both victims "unavailable" for the purposes of testifying at defendant's discharge hearing. Evaluating the totality of the evidence and conducting a qualitative, commonsense assessment of it within the context of the case (*People v. Belknap*, 2014 IL 117094, ¶¶ 52-53, 23 N.E.3d 325), we can easily conclude admission of the statement was the sort of "prejudicial error" to which *Sebby* referred. "[A] defendant who has shown clear error and closely balanced evidence

has shown prejudice and is entitled to relief under the first prong of the plain error doctrine." *Sebby*, 2017 IL 119445, ¶ 64 (citing *Piatkowski*, 225 Ill. 2d at 568). Accordingly, we find defendant was unable to provide a voluntary and knowing waiver of his *Miranda* rights as a result of his intellectual disability and the trial court erred in denying defendant's motion to suppress. Further we find it was first-prong plain error and a violation of defendant's *Miranda* rights for Detective Hufford to fail to honor defendant's request for counsel. Therefore, we remand this matter to the trial court for further proceedings consistent with this order. We decline to address the other issues raised by defendant in light of our remand.

¶ 36                              III. CONCLUSION

¶ 37            For the reasons stated, we reverse the trial court's judgment and remand the cause for a new discharge hearing consistent with this order.

¶ 38            Reversed and remanded.


¶ 39            JUSTICE TURNER, dissenting:

¶ 40            I respectfully dissent. Because I agree with the trial court's decision to deny defendant's motion to suppress, I would affirm the trial court's judgment denying defendant's motion for discharge.

¶ 41            Initially, I note the trial court first heard testimony from Detective Hufford at the hearing held pursuant to section 115-10(b) of the Code (725 ILCS 5/115-10(b) (West 2016)). The detective indicated he provided defendant with *Miranda* warnings before defendant made any inculpatory statements. No one questioned the detective on whether defendant appeared to understand the warnings. The detective testified he recorded the entire interview. According to the detective, defendant's inculpatory statements included his admissions he had (1) inserted his penis and fingers into the female child's vagina, (2) touched his penis on her mouth, (3) touched the

- 20 -

male child's penis, and (4) made the male child touch his penis.

¶ 42 Moving on to the suppression hearing, the parties stipulated to a foundation for the admissibility of the DVD recording of the detective's interview of defendant. The trial court then watched the DVD in its entirety, took the matter under advisement, and allowed the State and defendant to submit written arguments.

¶ 43 At a subsequent hearing, the trial court commented that it had considered the evidence presented and the parties' arguments. The court then found the detective explained to defendant his *Miranda* rights, defendant understood his rights, and defendant knowingly and voluntarily made statements to the police. According to the court, defendant's understanding was displayed when he asked for an attorney shortly after the detective's questioning began. After considering all the evidence before it, the court stated:

> "[T]he Court finds that the defendant knowingly and voluntarily waived his rights, and regardless of the mental functioning of the defendant, he demonstrated that he understood what his rights were, and that is consistent with the reports that he is able to function on a mild retardation basis, and that's basically what he demonstrated during the interview, that while he does have limitations, he is able to function. He knew what his rights were. He invoked his rights. And then once he invoked his rights, then he again waived his rights. It was explained to him again, and he did a knowing waiver, and there is no reason to believe that once he invoked his rights that he didn't know then that he could invoke his rights again and ask for an attorney, and he did not do that."

¶ 44 The court then denied defendant's motion to suppress. The court additionally found the youngest of the two children defendant admitted he molested was unavailable to testify.

¶ 45		At the outset of the discharge hearing, the trial court found the oldest child was also unavailable to testify. The minors' grandmother and mother then testified about the statements the children made when they confided in them. The mother indicated the two children defendant assaulted were her 10-year-old daughter and her 7-year-old son. In addition, Detective Hufford testified about his interview of defendant and explained he had advised defendant at the outset of the interview that it would be recorded. As before, the detective was not questioned on whether defendant appeared to understand the *Miranda* warnings, although defendant did renew his motion to suppress. Over defendant's objection, the trial court then, for the second time, reviewed the DVD in its entirety. The trial court denied defendant's discharge motion and found defendant not acquitted on all five counts.

¶ 46		While denying a posthearing motion filed by defendant, the trial court reiterated many of the findings it made when denying defendant's motion to suppress. The court also distinguished the situation in this case from *Braggs*, which was heavily relied upon by defendant.

¶ 47		In *Braggs*, a detective advised the defendant of her *Miranda* rights from a standard form without any further explanation. *Braggs*, 209 Ill. 2d at 499. The defendant gave no verbal responses to the warnings, merely nodded her head affirmatively, and never signed a waiver form. *Braggs*, 209 Ill. 2d at 499. Moreover, the detective acknowledged the defendant's purported sister and guardian initially was needed as an interpreter in order for the detective to communicate with the defendant. *Braggs*, 209 Ill. 2d at 499. The court noted the purported sister was still acting as an interpreter when the defendant made her inculpatory statements. *Braggs*, 209 Ill. 2d at 499-500.

¶ 48		Here, defendant did give verbal responses to the *Miranda* warnings and signed a waiver of rights form. Additionally, the detective here explained defendant's *Miranda* rights in detail, and, unlike in *Braggs*, an interpreter was not required for the detective to communicate with

defendant.

¶ 49 Also, in *Braggs*, a psychiatrist testified the defendant was moderately mentally retarded, and a clinical psychologist testified the defendant was mentally retarded. *Braggs*, 209 Ill. 2d at 500-01. Both of the experts opined the defendant was unable and incapable of understanding her *Miranda* warnings. *Braggs*, 209 Ill. 2d at 500-02.

¶ 50 In the case *sub judice*, Dr. Froman's single report and Dr. Holt's multiple progress reports were introduced into evidence. All of the reports indicated the evaluations were prepared to determine whether defendant was fit to stand trial. According to Dr. Holt's reports, defendant's level of adaptive functioning decreased defendant's intellectual disability from the moderate range to the mild range. Neither psychologist testified at any time during the hearings held by the court.

¶ 51 Dr. Froman's sole report indicates they "went over" defendant's rights and defendant did not understand them. However, it is unclear what rights the doctor was referencing because the purpose of his examination was to determine whether defendant was fit to stand trial. Moreover, the examination and the report were completed almost a year before defendant's counsel filed a motion to suppress evidence.

¶ 52 The standards for determining fitness to stand trial and whether a confession is freely and voluntarily made are quite different. *People v. Stephens*, 2012 IL App (1st) 110296, ¶ 95, 980 N.E.2d 654 (citing *People v. Rockamann*, 79 Ill. App. 3d 575, 580-81, 399 N.E.2d 162, 166 (1979)). Additionally, and in any event, a trial court is not required to accept the opinion of a psychiatrist or psychologist on whether a defendant understood *Miranda* warnings. *People v. Walker*, 2012 IL App (1st) 083655, ¶ 44, 973 N.E.2d 939.

¶ 53 In my view, *W.C.*, 167 Ill. 2d 307, more closely resembles our case than does *Braggs*. In *W.C.*, the 13-year-old minor was charged with delinquency based upon the offense of

murder. *W.C.*, 167 Ill. 2d at 311-12. The evidence showed the minor, accompanied by his mother, was taken to an interview room in a police station where he gave a statement. *W.C.*, 167 Ill. 2d at 313. According to officers, the minor answered each *Miranda* query by stating, "I understand." *W.C.*, 167 Ill. 2d at 313.

¶ 54　　　After a pause during the interview, an assistant state's attorney entered the interview room and repeated *Miranda* warnings to the minor. The minor eventually signed a written statement in which he made inculpatory admissions. *W.C.*, 167 Ill. 2d at 314-15. The signed statement included the minor's acknowledgement he had been advised of and understood his constitutional rights, including his right to a lawyer, and that the assistant state's attorney was a prosecutor and not his lawyer. *W.C.*, 167 Ill. 2d at 314.

¶ 55　　　A hearing was later held to address whether the minor should be prosecuted as an adult. *W.C.*, 167 Ill. 2d at 315. Evidence at the hearing included a social report, which indicated the minor was in the sixth grade but had received failing grades throughout his education. *W.C.*, 167 Ill. 2d at 315. Additionally, a school psychologist testified the minor was illiterate and moderately mentally retarded. *W.C.*, 167 Ill. 2d at 315. According to the psychologist, the minor had an IQ of 48 and was developmentally equivalent to a six- to eight-year-old child. *W.C.*, 167 Ill. 2d at 315. A court psychologist prepared a psychological examination summary, which also described W.C. as being moderately, mentally retarded with the emotional maturity of a six- to seven-year-old child. *W.C.*, 167 Ill. 2d at 315-16. The trial court ultimately determined the minor should not be transferred to the criminal division. *W.C.*, 167 Ill. 2d at 316.

¶ 56　　　The minor's counsel then filed a motion to suppress the minor's incriminating statements, alleging he did not knowingly and intelligently waive his right to remain silent and his right to counsel. *W.C.*, 167 Ill. 2d at 316. At the suppression hearing, the minor's evidence from

- 24 -

the transfer hearing was introduced by stipulation. Additionally, the school psychologist testified it was her opinion the minor could not have understood his *Miranda* warnings at the time of his arrest. *W.C.*, 167 Ill. 2d at 316. The State presented the testimony of two police officers who had previously read *Miranda* warnings to the minor on other occasions. They testified he had indicated he understood the warnings, and, on one occasion, the respondent refrained from answering questions. *W.C.*, 167 Ill. 2d at 316. The assistant state's attorney testified she gave the respondent *Miranda* warnings and also explained the *Miranda* rights. *W.C.*, 167 Ill. 2d at 316-17. Finally, the minor "testified by responding in few words, by not remembering and with inconsistency." *W.C.*, 167 Ill. 2d at 317. Ultimately, the circuit court denied the motion to suppress, and the respondent was later adjudicated delinquent. *W.C.*, 167 Ill. 2d at 317. The appellate court affirmed the minor's delinquency adjudication. *W.C.*, 167 Ill. 2d at 312.

¶ 57    On appeal to the supreme court, the minor challenged the trial court's denial of his motion to suppress. *W.C.*, 167 Ill. 2d at 327. The supreme court extensively cited the school psychologist's testimony, including her opinion the minor could not have understood the words " 'remain,' 'against,' 'during,' 'formal,' 'hire[,]' and would absolutely not have understood the word 'appointed.' " *W.C.*, 167 Ill. 2d at 329-30.

¶ 58    The supreme court concluded the school psychologist's testimony, a court psychologist's summary, and the social investigation report "left little doubt that W.C. did not possess the ability to understand the words and terms contained in standard *Miranda* warnings." *W.C.*, 167 Ill. 2d at 335. Nonetheless, the court found it was "not so clear from this evidence, however, that W.C. would have been unable to understand [the assistant state's attorney's] explanation of the *Miranda* warnings." *W.C.*, 167 Ill. 2d at 335. Citing the assistant state's attorney's "concrete, nonabstract" terminology, the supreme court concluded W.C., even with his

- 25 -

"quantifiable intellectual limitations," may have been able to understand the assistant state's attorney's explanation. *W.C.*, 167 Ill. 2d at 335. The supreme court then stated:

> "[A]s a court of review, we are not prepared to say that the trial court's firsthand assessment of W.C. was wanting. A trial court sits in a uniquely advantageous position when evaluating a witness'[s] subjective mental capabilities. Accordingly, we conclude that the circuit court's determination that W.C.'s waiver was valid was not against the manifest weight of the evidence." *W.C.*, 167 Ill. 2d at 335.

¶ 59 In the case before this court, I am not prepared to say the trial court's assessment of defendant was "wanting." Defendant appeared before the trial court on several occasions even though he did not testify. The court heard and observed the detective's testimony and twice reviewed the recording of defendant's interview. The court observed defendant was read the *Miranda* warnings on two occasions and the detective twice explained the defendant's rights to him in different terminology. The court also indicated the interview "was not coercive at all."

¶ 60 Like the trial court, I have twice reviewed the video recorded interview of defendant in its entirety. Further, I have several times watched the segment of the DVD which includes defendant's request for a lawyer, the exchanges between the detective and defendant after the request, and the rereading of *Miranda* rights with a second detective present. Having done so, I agree with the trial court's assessment of the interview and would find the trial court's conclusions and findings defendant voluntarily and knowingly waived his *Miranda* rights are not against the manifest weight of the evidence.

¶ 61 Defendant also argues a *Miranda* violation occurred when the detective did not cease questioning after defendant asked if he could talk to a lawyer. Defendant maintains the detective's reference to the state's attorney and jail amounted to a threat overcoming defendant's

will. According to defendant, this "threat" was intended to induce defendant to make an incriminating statement. The threat thus constituted the initiation of further conversation with defendant. In essence, defendant argues the detective's statement was the equivalent of further interrogation in violation of *Miranda*.

¶ 62        While this explicit argument was not made to the trial court, the court noted the detective stopped the interrogation and told defendant he would speak with the state's attorney to determine if defendant should be held in the jail. The court pointed out defendant then said he wanted to talk to the detective. According to the court, "The officer explained to [defendant] that [defendant] asked for an attorney and so the interview had to stop." However, the court found defendant "insisted he wanted to speak with the officers." The detective later returned with another officer and again advised defendant of his rights. The court stated that "although [defendant] was unable to tell the officers what [his rights] were in full, he stated he understood [his rights]." The court noted the officers read defendant his rights, asked defendant about his rights, explained those rights to defendant, and defendant provided appropriate answers to the officer's questions. The court also stated the interview was not very long and the detective did not really ask leading questions.

¶ 63        I construe the trial court's comments to mean it did consider whether defendant initiated further conversation with the detective after defendant invoked his rights. The trial court determined it was defendant who decided to proceed with the interview, as opposed to having the detective discontinue the interview and contact the state's attorney to determine if defendant should be jailed. See *Woolley*, 178 Ill. 2d at 200 (finding the trial judge's comments showed he was aware that whether the defendant initiated further conversation was a necessary determination). Regardless, well-settled case law does not support defendant's position the

detective's statement constituted further interrogation. Our supreme court has stated:

> "Under *Miranda* and its progeny, once an individual states that he wants an attorney, all interrogation must cease until an attorney is present. [Citation.] 'Interrogation' is defined as 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (Emphasis added.) *Enoch*, 122 Ill. 2d at 193 (quoting *Innis*, 446 U.S. at 301).

¶ 64　This case presents a situation where the transcript of defendant's interview might suggest the detective's actions and demeanor were imperious toward defendant after defendant initially asked for a lawyer, especially considering defendant's intellectual disability. However, the trial court clearly determined that the video recording showed the detective did not bully, coerce, or lie to defendant about what was going to happen. The court apparently determined the detective would have ended the interview had defendant not stated he wanted to speak further with the detective instead of speaking with a lawyer.

¶ 65　Moreover, even if the detective's statement could conceivably be interpreted as reasonably likely to elicit an incriminating statement, the detective's statement he would be contacting the state's attorney about defendant's incarceration constituted words "attendant to arrest and custody." See *Enoch*, 122 Ill. 2d at 193. Thus, defendant's argument the detective's response to defendant's request for a lawyer violated *Miranda* necessarily fails.

¶ 66　In conclusion, and in light of all the foregoing, I would affirm the trial court's judgment denying defendant's motion for discharge. I would further affirm the trial court's judgment finding defendant not acquitted on all counts.

**No. 4-19-0103**

| | |
|---|---|
| **Cite as:** | *People v. Kadow*, 2021 IL App (4th) 190103 |
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No.17-CF-644; the Hon. Robert K. Adrian, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Joel C. Wessol, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and Lara L. Quivey, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |