2023 IL App (4th) 210355

NO. 4-21-0355

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| CHARLES DRAIN, | ) | No. 19CF400 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas E Griffith Jr., |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Steigmann and Doherty concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a stipulated bench trial, defendant, Charles Drain, was convicted of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(B) West 2018)). The trial court sentenced defendant to nine years' imprisonment. Defendant appeals, arguing that the court erred in denying his motion to suppress evidence recovered during a traffic stop and, alternatively, that his counsel provided ineffective assistance in failing to challenge the reliability of a positive canine alert for cocaine inside his vehicle. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3        We include only those facts necessary to our disposition of the issues raised by defendant. In March 2019, the State charged defendant by information with unlawful possession of 900 grams or more of cocaine with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2018)) and unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(D) (West 2018)). The

charges arose out of a traffic stop of defendant's vehicle on March 11, 2019. The police stopped defendant's vehicle for violating section 11-907(c) of the Illinois Vehicle Code (625 ILCS 5/11-907(c) (West 2018)) (known as "Scott's Law"), which requires the driver of a motor vehicle, approaching a stationary emergency vehicle displaying hazard lights, to switch lanes or reduce speed if changing lanes would be impossible or unsafe. Following a positive canine sniff alert, police found cocaine in the trunk. The State later amended the information and proceeded against defendant on one count of unlawful possession of between 100 and 400 grams of cocaine with intent to deliver (720 ILCS 570/401(a)(2)(B) (West 2018)).

¶ 4        In March 2020, defendant filed a motion to suppress evidence. Defendant argued that the traffic stop and vehicle search were illegal and that all statements he made to the police during the stop were inadmissible, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 5        A hearing on the motion to suppress occurred in October 2020. Deputy Matthew Hunt of the Macon County Sheriff's Office was the sole witness. Hunt testified to the following. In March 2019, Hunt was a detective and K-9 handler with the criminal interdiction unit. At 11:26 a.m. on March 11, 2019, he was completing a traffic stop involving an unrelated motorist on Interstate 72. Hunt and the motorist were sitting in Hunt's squad car, which had its emergency lights activated and was parked behind the motorist's vehicle. Hunt explained that for all traffic stops, he asks drivers to accompany him to his squad car for "safety, clarification on information, community policing," and because it "takes out the question" of what the officer is doing. Upon concluding the stop, Hunt and the motorist got out of the squad car, and Hunt began walking the motorist back to his vehicle.

¶ 6        Hunt testified that, while he and the motorist were between their vehicles, he saw a blue Hyundai Accent, which Hunt later determined was driven by defendant, approaching from

behind in the lane closest to them. Hunt explained that Interstate 72 is flat and that nothing obstructed his view of the roadway or the shoulder. As such, he was able to see a "considerable distance" and saw defendant's vehicle approaching from far away. Hunt testified that as defendant approached, traffic was light. There was a semi-tractor trailer in the lane to the left of defendant's vehicle, but no other vehicle was in front of or behind either defendant's vehicle or the semi-tractor trailer. Hunt raised his hand and pointed, indicating to defendant "to get over." However, defendant did not activate his turn signal or move into the lane to his immediate left, and defendant drove by Hunt while still in the lane nearest to him. Hunt testified that the semi-tractor trailer "had almost completely passed [defendant] at that time." Hunt acknowledged that as defendant's vehicle passed the squad car, defendant's brake lights were activated.

¶ 7        People's exhibit 1 was played for the trial court. People's exhibit 1, which this court has reviewed, is a video of Hunt's traffic stop of the unrelated motorist, as depicted by both a camera pointing out the front of Hunt's squad car (front camera) and a camera pointed toward the interior of the squad car depicting the front and back seats (interior camera). In the relevant portion of the video, the interior camera depicts Hunt in the driver's seat filling out a warning and speaking with the motorist, who is sitting in the passenger's seat. The roadway can be seen through the squad car's windows. The weather conditions are clear and sunny. At 11:26:26 a.m., Hunt exits his squad car with the motorist to escort him back to his vehicle. The front camera shows that, while Hunt and the motorist are standing between their vehicles, Hunt looks behind his squad car for several seconds. He raises his hand to point, signaling to an oncoming vehicle to switch lanes. At 11:26:38 a.m., a semi-tractor trailer and defendant's vehicle appear in frame of the interior camera, approaching the squad car from behind. Defendant's vehicle is in the lane closest to the squad car, and the semi-tractor trailer is in the lane to the left of defendant's vehicle. As defendant's

vehicle passes the squad car, it is adjacent to the back of the trailer being hauled by the semi-tractor trailer such that the trailer is nearly clear of defendant's vehicle. The front camera shows that, as defendant drives by the squad car, defendant's brake lights are activated.

¶ 8          Hunt testified that he determined that defendant had committed a traffic violation, so he got into his squad car and followed defendant's vehicle to initiate a stop. People's exhibit 2, which was played for the trial court and has been reviewed by this court, is a recording of the stop as depicted by the front camera and interior camera. The stop occurred at 11:31 a.m. on the shoulder of the interstate. Hunt testified that he approached the passenger side of defendant's vehicle and asked defendant for his license and proof of insurance. Defendant handed Hunt his license and—because the vehicle was a rental—the rental agreement. Hunt testified that he informed defendant that he would only issue a warning and told defendant, "I'm going to have you come back to my squad car." Hunt testified that he was armed, but he did not have his gun drawn. Hunt did not handcuff defendant. Defendant followed Hunt and sat in the front passenger seat of the squad car while Hunt sat in the driver's seat. As Hunt and defendant got into the squad car, defendant told Hunt that he did not know that he needed to move over while passing a squad car.

¶ 9          Hunt testified that he began reviewing the rental agreement and running "all the record checks," which included checking defendant's license and registration, checking for any warrants, and reviewing defendant's criminal history. Hunt explained that he had a computer in his squad car with access to LEADS, which is used to check registrations, names, dates of birth, and warrants. Each check requires a separate inquiry to be run. Hunt testified that he began running those searches.

¶ 10         People's exhibit 2 showed that, while Hunt ran those searches, he asked defendant where he was going. Defendant responded that he was going to Macon to visit his grandmother,

who was sick. Defendant also stated that he planned to spend the night there, but he told Hunt that he did not have an overnight bag with him. Hunt testified that defendant "didn't appear to be comfortable" while speaking with him. Hunt explained that defendant "wasn't moving a whole lot," and "his breathing appeared *** to kind of intensify" as they talked. Hunt asked defendant if he was "all right" because he was breathing heavily, and defendant responded that he was "out of shape." Hunt testified that several chimes could be heard on the video from his squad car computer, and he explained that they were responses being returned from the inquiries he was running.

¶ 11 At 11:39:16 a.m., Hunt told defendant, "Your license looks good to go." At 11:39:20 a.m., Hunt told defendant that he was going to write a warning, and he began to fill it out. As Hunt did so, he asked defendant if he was ever arrested for anything. Defendant responded that he had a misdemeanor from when he was 17. Hunt testified, however, that upon running a criminal history check, he learned that defendant's criminal history included additional offenses.

¶ 12 People's exhibit 2 showed that, while Hunt was still in the process of writing the warning, Officer Wolfe arrived at the scene, approached Hunt's squad car, and began asking defendant where he was going. At 11:41:57 a.m., Hunt asked Wolfe to finish writing the warning. Hunt testified that he did so because he had decided to conduct a canine sniff around defendant's vehicle. People's exhibit 2 showed that between 11:39:20 a.m., when Hunt began writing the warning, and 11:41:57 a.m., when he asked Wolfe to continue writing it, Hunt was continuously filling out the warning. Hunt testified that he could not recall how much of the warning he had written when he asked Wolfe to take over.

¶ 13 Hunt testified that he asked defendant, "Is it okay if I run the dog around?" and that defendant consented. While Wolfe continued writing the warning, Hunt deployed his canine for a free air sniff of defendant's vehicle. In response to questioning from defendant's counsel, Hunt

testified that he is a trained canine officer and that his canine was trained to alert to narcotics. Hunt explained that an alert constitutes "the distinct changes in behavior that I'm familiar with with [*sic*] working with the dog itself, so it's through our training and experience." Hunt further testified that the dog's "final response can vary," depending on the location of the drug and could be "a down" or "a sit."

¶ 14     Hunt explained that the canine first gave "a distinct change of behavior on the rear passenger side" of defendant's vehicle. Hunt saw the dog's nose "get a little birdy and his breathing become[ ] more labored as he appear[ed] to be in odor recognition." Upon reaching the rear driver's side, the canine provided a final response by sitting. People's exhibit 2 showed that between 11:41:57 a.m., when Hunt asked Wolfe to take over the warning, and 11:43:29 a.m., when the canine gave a final alert, Wolfe was persistently filling out the warning.

¶ 15     Hunt returned to defendant and asked him what was in the trunk, but defendant did not answer. Hunt began to search defendant's vehicle. In the trunk, Hunt found a box containing a vacuum-sealed substance that he believed to be cocaine. Hunt placed defendant in handcuffs and read him his *Miranda* rights, at which point defendant stated that he did not want to talk with the officers.

¶ 16     Following Hunt's testimony, defendant's counsel argued that there was no probable cause to stop defendant based on a Scott's Law violation because a semi-tractor trailer blocked defendant from moving into the left lane, so defendant complied with the law by slowing down as he passed Hunt. Counsel also argued that all statements defendant made while in Hunt's squad car should be suppressed because defendant was not read his *Miranda* warnings until after the police located the cocaine in his trunk. Finally, counsel asserted that the search of defendant's vehicle

was illegal because the police delayed the stop to conduct the canine sniff, and defendant's behavior in Hunt's squad car did not give rise to a reasonable suspicion for the search.

¶ 17　　　　The State responded that defendant violated Scott's Law because it was possible for him to switch lanes by slowing down and moving over before passing the squad car. The State further argued that no *Miranda* violation occurred because defendant was not in custody while he was sitting in Hunt's squad car. Finally, the State argued that the officers did not prolong the stop to conduct the canine sniff, and in any event, defendant's behavior gave rise to a reasonable suspicion for the sniff.

¶ 18　　　　The trial court denied the motion to suppress. The court found that there was "clearly a Scott's Law violation" because defendant could have braked and gotten behind the semi-tractor trailer so that he was not adjacent to Hunt's squad car when he drove past. The court further found that, while "there was some delay, about 11 minutes," the delay was not unreasonable because, during that time, Hunt was checking LEADS, defendant's driver's license, his criminal history, and the rental agreement. Further, Hunt was "still writing the warning ticket at the time [Wolfe] arrive[d]." In finding that the canine alert provided probable cause to search defendant's vehicle, the court noted,

> "I've always wondered about dogs indicating on vehicles and that providing a proper basis to search; but it's not my role to sit up here and pontificate. I have to follow the law. Clearly, the dog indicated on the vehicle[,] which gave the officer probable cause to search the vehicle."

Finally, the court found that defendant's *Miranda* rights were not violated while he spoke with Hunt in his patrol car, because that interaction was not a custodial interrogation. The court found, however, that "once the dog indicates and the officer locates the package, if there are any

questions of the defendant and responses elicited after that point, those responses would be suppressed."

¶ 19     On November 30, 2020, defendant's counsel filed a motion to reconsider the denial of the motion to suppress. On June 17, 2021, the trial court denied the motion.

¶ 20     Following a stipulated bench trial, the trial court found defendant guilty of possession of a controlled substance with intent to deliver. Defendant's counsel noted that he did not believe he needed to file a motion for a new trial "because that won't be a contested issue on appeal." The court asked counsel if he believed the motion to reconsider the denial of the motion to suppress "covers you procedurally," and counsel responded, "I think so." Thereafter, the trial court sentenced defendant to nine years' imprisonment. Defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22     Defendant argues that the trial court erred in denying his motion to suppress because (1) there was no probable cause for the traffic stop, (2) the police questioned him without *Miranda* warnings while he sat in the front of Hunt's squad car, (3) the police unlawfully prolonged the stop to conduct a canine sniff, (4) no reasonable suspicion existed to conduct the canine sniff, and (5) the State failed to present evidence to establish the dog's reliability. Defendant acknowledges that these issues are unpreserved because his counsel did not raise them in a post-trial motion. However, defendant argues that they are reviewable under the plain-error doctrine.

¶ 23     Under the plain-error doctrine, a reviewing court may consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error is so serious that it affected the

fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Kadow*, 2021 IL App (4th) 190103, ¶ 17. The first step in any plain-error analysis is to determine whether there was a clear or obvious error. *Kadow*, 2021 IL App (4th) 190103, ¶ 18.

¶ 24     When a defendant challenges the trial court's ruling on a motion to suppress, the reviewing court conducts a two-part analysis. *Kadow*, 2021 IL App (4th) 190103, ¶ 22. Specifically, we examine whether the trial court's factual findings are against the manifest weight of the evidence, and we review *de novo* the trial court's ruling on the motion to suppress. *Kadow*, 2021 IL App (4th) 190103, ¶ 22. The trial court's findings of fact are given great deference, and they will not be deemed against the manifest weight of the evidence unless the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *People v. Dunmire*, 2019 IL App (4th) 190316, ¶ 35.

¶ 25                    A. Probable Cause for the Stop

¶ 26     Defendant argues that the trial court erred in denying his motion to suppress because Hunt did not have probable cause to stop his vehicle. Specifically, defendant contends that he did not violate Scott's Law because a semi-tractor trailer was in the lane adjacent to him, so that he could not switch lanes, and he slowed down as he passed Hunt's squad car. The State responds that it was possible for defendant to have safely switched lanes so that he would not have been next to Hunt's squad car when he passed it.

¶ 27     At the time of the offense, Scott's Law provided:

    "Upon approaching a stationary authorized emergency vehicle, when the authorized emergency vehicle is giving a signal by displaying *** warning lights, a person who drives an approaching vehicle shall:

- 9 -

(1) proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least 4 lanes with not less than 2 lanes proceeding in the same direction as the approaching vehicle; or

(2) proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe." 625 ILCS 5/11-907(c) (West 2018).

¶ 28    The primary objective in construing a statute is to give effect to the legislature's intent, which is best gleaned from the statutory language, given its plain and ordinary meaning. *People v. Gaytan*, 2015 IL 116223, ¶ 23.

¶ 29    Defendant argues that when he passed Hunt's squad car, "and even before," it "would not have been possible" or safe to make a lane change because a semi-tractor trailer was in the lane to the left of his vehicle. He asserts that he appropriately reduced his speed and proceeded with caution until he passed Hunt's squad car, such that he acted in compliance with section 11-907(c)(2).

¶ 30    In determining that probable cause for the stop existed, the trial court concluded that section 11-907(c)(2) did not apply, because that provision applies only if changing lanes would be impossible or unsafe. The court found that defendant could have safely braked and moved into the left lane behind the semi-tractor trailer.

¶ 31    These findings are not against the manifest weight of the evidence. Hunt testified that Interstate 72 is flat and that nothing obstructed his view of the roadway or the shoulder, such that he saw defendant's vehicle approaching from far away. Hunt testified that his emergency

lights were on at that time. Hunt also explained that, as defendant approached, traffic was light. While a semi-tractor trailer was in the lane to the left of defendant's vehicle, there were no other vehicles in front of or behind defendant's vehicle or the semi-tractor trailer. Hunt further testified that he pointed for defendant to "get over," but defendant did not activate his turn signal or switch lanes. While defendant contends that he appropriately braked as he passed Hunt's patrol car because the semi-tractor trailer prevented him from switching lanes, Hunt testified that the semi-tractor trailer "had almost completely passed [defendant] at that time." Additionally, Hunt testified that defendant told him he did not know he needed to switch lanes while approaching the squad car. People's exhibit 1 supports Hunt's testimony, as it shows that, before and during the time that defendant's vehicle passed Hunt's squad car, defendant's vehicle was adjacent to the back end of the semi-tractor trailer, which had nearly cleared defendant's vehicle. Additionally, approximately 12 seconds elapsed between when Hunt exited his squad car and when defendant's vehicle first came into the frame of the interior camera. From this evidence, the trial court reasonably found that defendant had a sufficient opportunity to allow the semi-tractor trailer to pass him so that he could safely change lanes before passing Hunt's patrol car.

¶ 32 The record contradicts defendant's assertion that the trial court incorrectly interpreted Scott's Law to mean that a driver must attempt to change lanes "at a specific point before passing the emergency vehicle" or "as soon as he or she sees a stationary emergency vehicle." Instead, the record establishes that the trial court properly considered only whether it was *possible* for defendant to safely change lanes. Having found that it was possible here but that defendant failed to do so, the trial court did not err in concluding that probable cause existed to stop defendant's vehicle. Consequently, we find no error and, therefore, no plain error.

¶ 33 B. Whether Hunt's Questioning of Defendant Was a Custodial Interrogation

- 11 -

¶ 34 Next, defendant argues that the trial court should have suppressed statements he made to Hunt while he sat in the front seat of Hunt's squad car because he was in custody and was not given *Miranda* warnings.

¶ 35 A defendant's statements pursuant to a custodial interrogation are inadmissible unless preceded by the defendant's knowing and intelligent waiver of his right not to be compelled to testify against or incriminate himself and his right to an attorney during the interrogation. *Miranda*, 384 U.S. at 444. An officer intending to subject a person to custodial interrogation must first warn him of his right to remain silent, that any statement he makes may be used as evidence against him, and that he has a right to the presence of an attorney before questioning him. *Miranda*, 384 U.S. at 444. Any statements or evidence seized upon information obtained in violation of *Miranda* are inadmissible as "fruit of the poisonous tree." *People v. Jordan*, 2011 IL App (4th) 100629, ¶ 16 (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

¶ 36 A "custodial interrogation" is questioning that is initiated by an officer after a person is taken into custody or otherwise deprived of freedom of action in any significant way. *Jordan*, 2011 IL App (4th) 100629, ¶ 17. An interrogation is custodial if a reasonable person, under the circumstances, would have felt that he or she was not at liberty to terminate the interrogation and leave. *Jordan*, 2011 IL App (4th) 100629, ¶ 17. In determining whether an interrogation was custodial, relevant factors to be considered include (1) the time and place of the confrontation, (2) the number of officers present, (3) the presence or absence of family or friends, (4) any indicia of a formal arrest procedure including physical restraint, the show of weapons or force, booking, or fingerprinting, and (5) the manner by which the individual arrived at the place of the interrogation. *Jordan*, 2011 IL App (4th) 100629, ¶ 18.

¶ 37        Defendant argues that he was in custody when Hunt told him "I'm going to have you come back to my squad car" and had defendant sit in the front passenger seat. He contends, therefore, that Hunt should have given him the *Miranda* warnings before questioning him, and since Hunt did not, all subsequent statements should have been suppressed. This argument is unavailing.

¶ 38        We find *People v. Sims*, 2022 IL App (2d) 200391, instructive. In *Sims*, an officer stopped the defendant's vehicle after observing it make a sudden lane change on the interstate, nearly striking another vehicle. *Sims*, 2022 IL App (2d) 200391, ¶ 5. The officer walked to the driver's side of the defendant's vehicle and noticed the smell of cannabis emanating from it. *Sims*, 2022 IL App (2d) 200391, ¶ 6. After informing the defendant that he observed the sudden lane change, the officer asked defendant to come to his squad car and sit in the front passenger seat in case he had questions while he was writing a warning. *Sims*, 2022 IL App (2d) 200391, ¶ 11. The defendant complied. *Sims*, 2022 IL App (2d) 200391, ¶ 11. In the squad car, the officer conversed with defendant, who stated that he was driving to Wisconsin and had been in Indiana for the day. *Sims*, 2022 IL App (2d) 200391, ¶ 12. The officer then asked the defendant when the last time was that " 'someone smoked weed' " in his vehicle, and the defendant answered that someone likely smoked marijuana then got into his car; he denied that drugs were in the vehicle. *Sims*, 2022 IL App (2d) 200391, ¶ 13. The officer noticed that the defendant's chest appeared to be "pounding" and directed him to the back seat of the squad car. *Sims*, 2022 IL App (2d) 200391, ¶ 14. The officer then searched the defendant's vehicle and located cannabis and a scale. *Sims*, 2022 IL App (2d) 200391, ¶ 15. The defendant was convicted of possession of between 30 and 500 grams of cannabis with intent to deliver. *Sims*, 2022 IL App (2d) 200391, ¶ 56.

¶ 39    The defendant appealed, arguing, *inter alia*, that his counsel was ineffective for failing to move to suppress his statements to the officer while sitting in the squad car and before he was given the *Miranda* warnings. *Sims*, 2022 IL App (2d) 200391, ¶ 135. The defendant asserted that he was not free to leave when the officer directed him to get into the front of the squad car, nor would a reasonable person have felt at liberty to terminate the interrogation and leave. *Sims*, 2022 IL App (2d) 200391, ¶ 141. The appellate court rejected that argument. *Sims*, 2022 IL App (2d) 200391, ¶ 143. The court concluded that, under the totality of the circumstances, the defendant was not in custody because the "mere fact of asking defendant to sit in the front seat of the squad car did not constitute a custodial situation." *Sims*, 2022 IL App (2d) 200391, ¶ 143. The court reasoned that it was daytime and there was only one officer at the time of the questioning. *Sims*, 2022 IL App (2d) 200391, ¶ 144. Additionally, there were no indicia of a formal arrest because the defendant had not been handcuffed, the officer did not draw his weapon, and the defendant agreed to follow the officer to his squad car while they were in a public place. *Sims*, 2022 IL App (2d) 200391, ¶ 144. Moreover, the defendant was placed in the front passenger seat of the squad car, where a person in custody would not typically be placed. *Sims*, 2022 IL App (2d) 200391, ¶ 143. Accordingly, the court held that the defendant's counsel was not ineffective, because a suppression motion alleging that the defendant should have been given *Miranda* warnings would not have been meritorious. *Sims*, 2022 IL App (2d) 200391, ¶¶ 143-45.

¶ 40    Like *Sims*, defendant was not in custody while he conversed with Hunt in the front seat of the squad car. The stop occurred during the daytime, and Hunt was the only officer present when he requested that defendant accompany him to the squad car. Defendant complied with that request, and there were no indicia of a formal arrest at that time, as Hunt did not handcuff defendant, nor did Hunt have his weapon drawn. Importantly, Hunt directed defendant to sit in the

front passenger seat of his squad car, which is strong evidence that defendant was not in custody. See *People v. Buschauer*, 2016 IL App (1st) 142766, ¶ 32 (noting that it is "unlikely that any individual 'in custody' would be seated in the front passenger seat next to an officer"). Given the totality of the circumstances of the stop, we hold that defendant was not in custody. See *Sims*, 2022 IL App (2d) 200391, ¶ 144 (noting that, even assuming that the defendant could not leave the squad car, this did not "necessarily mean that he was in custody"; the totality of the circumstances suggested that he was not in custody). Accordingly, the trial court committed no error, and therefore, we find no plain error in denying defendant's motion to suppress on this basis.

¶ 41          C. Whether the Traffic Stop Was Unlawfully Prolonged for a Canine Sniff

¶ 42          Defendant argues that the trial court erred in denying his motion to suppress because the police unlawfully prolonged the seizure beyond the time reasonably required to complete the mission of the traffic stop in order to conduct a canine sniff that was not supported by reasonable suspicion. The State responds that the police did not unlawfully prolong the stop.

¶ 43          A police officer may stop and briefly detain a motorist when the officer sees the motorist commit a traffic offense, but the officer may not prolong the stop beyond the time reasonably required to satisfy its initial purpose. *People v. Sadeq*, 2018 IL App (4th) 160105, ¶ 52. The permissible duration of a traffic stop is determined by the seizure's "mission"—that is, to address the traffic violation that warranted the stop. *Sadeq*, 2018 IL App (4th) 160105, ¶ 52. In a traffic stop, the officer's mission amounts to checking the driver's license, finding out if there are any warrants against the driver, inspecting the vehicle's registration and proof of insurance, and deciding whether to issue a ticket. *Sadeq*, 2018 IL App (4th) 160105, ¶ 52. While an officer may conduct checks unrelated to the traffic stop's mission, the officer may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an

individual. *Sadeq*, 2018 IL App (4th) 160105, ¶ 52. In determining whether a stop has been unreasonably prolonged, courts employ a contextual, totality of the circumstances approach that considers the brevity of the stop and whether the police acted diligently during that stop. *Sadeq*, 2018 IL App (4th) 160105, ¶ 68.

¶ 44          Defendant contends, without citing authority, that the mission of the stop ended when Hunt told him that his "license looks good to go." He asserts that, at that point, the Scott's Law violation "had been addressed," such that he should have been released. However, an officer's mission includes deciding whether to issue a ticket to address the traffic violation. Indeed, the return of paperwork and issuance of a ticket is usually the clearest sign that the mission of a traffic stop is completed. *Sadeq*, 2018 IL App (4th) 160105, ¶ 79 (stating the mission of a stop concluded when officer completed the warning ticket); see also *People v. Thomas*, 2018 IL App (4th) 170440, ¶ 68 ("In this case, the mission of the traffic stop was done when [the officer] gave defendant a verbal warning for an obstructed windshield and told him he was free to leave."); *People v. McKelvy*, 2019 IL App (2d) 180630, ¶ 18 ("When a police officer conducts a routine traffic stop, the authority to detain a motorist will normally end when the officer has prepared a ticket or a warning and delivered it to the motorist."). Thus, we reject defendant's argument that the mission of the stop concluded when Hunt told him that his "license looks good to go."

¶ 45          That conclusion does not end our inquiry, however. The critical question in determining whether a stop has been prolonged by a dog sniff is not whether the sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs or adds time to the stop. *Sadeq*, 2018 IL App (4th) 160105, ¶ 69. If a canine detects drugs at a time when the officer would otherwise still have been writing a ticket, no time has been added to the stop. *People v. Heritsch*, 2017 IL App (2d) 151157, ¶ 13. Accordingly, there must be evidence that, but for the

- 16 -

activities unrelated to the mission of the stop, an officer would have finished writing a citation and delivered it to the defendant before a canine detects drugs in the defendant's vehicle. *Heritsch*, 2017 IL App (2d) 151157, ¶ 16. When an officer writes a ticket while another officer performs a dog sniff, there must be evidence that the mission of the traffic stop would have been completed before the dog sniff occurred. *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 38.

¶ 46 Defendant presented no such evidence. Instead, defendant merely concludes that Hunt "delayed completing the warning until [Wolfe] arrived on scene" because a "reasonable officer would certainly have been able to complete a written warning" prior to the canine sniff. This argument fails because defendant provides no support for his contention. See *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 32 (rejecting defendant's claim that officer "should have been able to conduct the necessary inquiries and write the warning within 'a minute or two' " because "defendant does not provide any support for this").

¶ 47 Here, the trial court found that the officers did not unreasonably delay the stop because Hunt conducted all the necessary inquiries and was "still writing the warning ticket at the time [Wolfe] arrive[d]." These findings were not against the manifest weight of the evidence. Hunt testified that, upon entering his squad car, he began running "all the record checks," including defendant's license, registration, criminal history, and warrants, before he started writing out the warning. People's exhibit 2 corroborated Hunt's testimony and depicted Hunt continuously filling out the warning until Wolfe arrived, at which point Hunt tasked Wolfe with completing it. Hunt testified that he had Wolfe continue writing the warning so that he could perform a canine sniff. People's exhibit 2 also depicted Wolfe persistently filling out the warning, during which time Hunt's canine alerted to the presence of drugs.

¶ 48 Although defendant "could have introduced evidence to show how long it would have taken the officers to complete the stop's mission by preparing and delivering a ticket or a warning," defendant failed to do so. *McKelvy*, 2019 IL App (2d) 180630, ¶ 24. While reasonableness requires diligence in completing a traffic stop, it does not require inhuman, machine-like efficiency, such that the traffic stop is completed as fast as possible, down to the second. *People v. Watkins*, 2019 IL App (4th) 180605, ¶ 36. Instead, the question is whether the stop was prolonged beyond the time reasonably required to complete that mission. *Watkins*, 2019 IL App (4th) 180605, ¶ 36. Because defendant presented no evidence of delay, we hold that the officers did not prolong the stop. In so concluding, we need not consider defendant's argument that the canine sniff was conducted without reasonable suspicion. See *Reedy*, 2015 IL App (3d) 130955, ¶ 31 ("[O]fficers do not need independent reasonable articulable suspicion of drug-related activity in order to perform a dog sniff pursuant to an ordinary traffic stop."). Thus, we find no error, and therefore there can be no plain error.

¶ 49 D. Evidence of Canine's Reliability

¶ 50 Defendant argues that the trial court erred in denying the motion to suppress, because the State failed to present evidence regarding the canine's training and the reliability of the canine sniff. Defendant contends that, as such, the court could not find that probable cause existed for the search of his vehicle. The State responds that it was defendant's burden to challenge the reliability of the sniff in the trial court. The State further responds that, in any event, the State did offer evidence that Hunt and the canine were trained and that the canine alerted to drugs in accordance with Hunt's experience with the canine.

¶ 51 Defendant relies on *Florida v. Harris*, 568 U.S. 237 (2013). In *Harris*, the Florida Supreme Court had held that probable cause for a vehicle search, based on a canine alert, requires

more than just evidence that the officer and canine had been trained and certified. *Harris*, 568 U.S. at 242. The Florida Supreme Court determined that the government needed to present evidence of the canine's "performance history," including how often the canine alerted in the field without contraband having been found. (Internal quotation marks omitted.) *Harris*, 568 U.S. at 242-43. Additionally, the government needed to present training and certification records, evidence of the experience and training of the officer handling the canine, and other evidence known to the officer about the canine's reliability. *Harris*, 568 U.S. at 242-43.

¶ 52    The Supreme Court of the United States reversed, holding that, contrary to the strict evidentiary checklist required by the Florida Supreme Court, the test for probable cause rejects "rigid rules, bright-line tests, and mechanistic inquiries" in favor of a flexible, all-things-considered approach. *Harris*, 568 U.S. at 244. The Court explained that, therefore, a drug-detection canine's reliability cannot depend on the government's satisfaction of multiple, independent evidentiary requirements. *Harris*, 568 U.S. at 245. The Court acknowledged that a defendant "must have an opportunity to challenge" evidence of a canine's reliability, "whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Harris*, 568 U.S. at 247. However, the Court clarified that a probable-cause hearing focusing on a canine's alert should proceed like any other, whereby, after the parties present their best case, the court evaluates the evidence under the totality of the circumstances. *Harris*, 568 U.S. at 247-48.

¶ 53    Seizing on *Harris*'s language that he should have had an opportunity to challenge evidence of a canine's reliability, defendant contends that, because the "State offered no evidence to establish proof that the dog performed reliably in detecting drugs," his counsel conducted only limited questioning of Hunt regarding the reliability of the sniff. Defendant asserts that, as such, the record was "entirely silent" as to the training of Hunt and the canine as well as the reliability

of the sniff, such that the trial court could not conclude that probable cause existed for the search. However, defendant misconstrues the burden of proof applicable to a motion to suppress. Section 114-12(b) of the Code of Criminal Procedure (725 ILCS 5/114-12(b) (West 2020)) provides that, when a defendant files a motion to suppress, the "judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant." Only if a defendant makes a *prima facie* showing that the evidence was obtained in an illegal seizure does the burden shift to the State to provide evidence to rebut the defendant's *prima facie* case. *Reedy*, 2015 IL App (3d) 130955, ¶ 45.

¶ 54          We find *Reedy* instructive. In *Reedy*, the defendants moved to suppress heroin obtained from their vehicle by three officers following a canine sniff during a traffic stop. *Reedy*, 2015 IL App (3d) 130955, ¶¶ 3, 11. At the hearing on the motion to suppress, one of the officers testified that the officer who conducted the sniff "is a trained narcotics officer and [the canine] is a trained narcotics dog." *Reedy*, 2015 IL App (3d) 130955, ¶ 11. After the trial court granted the motion to suppress, the State appealed. *Reedy*, 2015 IL App (3d) 130955, ¶¶ 12-13. On appeal, the defendants argued, *inter alia*, that the traffic stop was not supported by probable cause because the State offered no evidence that the narcotics canine was reliable. *Reedy*, 2015 IL App (3d) 130955, ¶ 44. The appellate court rejected that argument and reversed the trial court's grant of the motion to suppress. *Reedy*, 2015 IL App (3d) 130955, ¶¶ 45-46, 48. The court explained that it was not the State's burden to present evidence that the canine was reliable, but rather, it was the defendants' burden to present evidence that the canine was unreliable. *Reedy*, 2015 IL App (3d) 130955, ¶ 45. The defendants, however, failed to present such evidence, and they did not question the canine's reliability. *Reedy*, 2015 IL App (3d) 130955, ¶ 45. Accordingly, the defendants forfeited the issue. *Reedy*, 2015 IL App (3d) 130955, ¶ 45. The court also noted that testimony was presented at the

hearing that the canine "is a trained narcotics canine"; thus, because she alerted to the presence of narcotics inside the defendant's vehicle, probable cause existed to search it. *Reedy*, 2015 IL App (3d) 130955, ¶ 46.

¶ 55 In this case, if defendant wished to challenge the reliability of the canine and drug sniff, it was his burden to present evidence demonstrating that they were unreliable. Like *Reedy*, however, defendant presented no such evidence. In turn, Hunt testified that he and his canine had "training and experience" in that he was a trained canine officer and his canine was trained to alert to narcotics. Hunt further explained the "distinct changes in behavior" he observed when the canine alerted to the cocaine in defendant's vehicle, which were in accordance with his training and experience with the canine. Specifically, Hunt explained that he observed the canine's "nose get a little birdy" and "his breathing become[ ] more labored" at the rear passenger's side of defendant's vehicle before providing a "final response" at the rear driver's side by sitting. Defendant challenged none of this testimony and presented no evidence to suggest that the canine was unreliable. Probable cause to search a vehicle exists when a trained narcotics dog alerts to the presence of narcotics inside that vehicle. *Reedy*, 2015 IL App (3d) 130955, ¶ 46. Accordingly, the trial court properly found that, under the totality of the circumstances, probable cause existed for the search of defendant's vehicle. We find no error and, therefore, no plain error.

¶ 56 Alternatively, defendant argues that his counsel was ineffective in failing to challenge the reliability of the drug sniff. Defendant complains that counsel did not (1) question Hunt as to his qualifications, (2) argue to the trial court "that the State had failed to introduce any evidence regarding the dog or its handler's qualifications for making a positive alert," or (3) present an expert witness to challenge the reliability of the alert. The State responds that counsel did not provide ineffective assistance.

¶ 57        To prove that counsel rendered ineffective assistance, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that such deficient performance so prejudiced the defendant as to deny him or her a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). A defendant must establish that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. To prove prejudice when claiming that counsel was ineffective for failing to move to suppress evidence, a defendant must establish that the unargued suppression motion was meritorious and that there is a reasonable probability that the verdict would have been different without the excludable evidence. *People v. Eubanks*, 2021 IL 126271, ¶ 30. Counsel's decision whether to file a motion to suppress is generally a matter of trial strategy, which is entitled to great deference. *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 21. We will not find that counsel was ineffective for failing to file a meritless motion to suppress. *Rowell*, 2021 IL App (4th) 180819, ¶ 21.

¶ 58        We conclude that defendant has not demonstrated that counsel's representation was deficient. Had counsel argued that the State presented no evidence of Hunt's or the canine's qualifications for making a positive alert, that argument would have been meritless because, as noted above, Hunt (1) testified that he was a trained canine officer, (2) explained that his canine was trained to detect narcotics, (3) detailed the canine's behaviors upon alerting to the presence of drugs, and (4) testified that the canine gave a final alert for drugs in accordance with his training and experience with the canine. See *Reedy*, 2015 IL App (3d) 130955, ¶ 46 (finding probable cause where an officer testified that the officer who conducted sniff "is a trained narcotics officer and that Nina is a trained narcotics canine").

¶ 59 As to defendant's remaining arguments that counsel should have questioned Hunt about his qualifications and presented an expert witness to undermine the reliability of the sniff, defendant has not overcome the strong presumption that counsel acted reasonably. Decisions regarding which witnesses to call or what evidence to present are matters of trial strategy that are generally immune from claims of ineffective assistance of counsel. *People v. Brown*, 2018 IL App (4th) 160288, ¶ 47. Defendant makes no argument as to what additional questioning counsel might have engaged in with Hunt or what evidence an expert witness might have presented that would have called the reliability of the sniff into question. Indeed, given the foregoing evidence regarding Hunt's and the canine's training and experience, it was a reasonable strategy for counsel to simply accept Hunt's testimony rather than engage in additional questioning with him or present an additional witness that might have risked bolstering Hunt's or the canine's qualifications and the reliability of the search. Accordingly, we hold that defendant failed to establish that counsel acted unreasonably. Therefore, his ineffective assistance claim fails.

¶ 60                                III. CONCLUSION

¶ 61 For the reasons stated, we affirm the trial court's judgment.

¶ 62 Affirmed.

*People v. Drain*, **2023 IL App (4th) 210355**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Macon County, No. 19-CF-400; the Hon. Thomas E. Griffith Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Blaire C. Dalton, of Dalton Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Scott Rueter, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |